Dr. Ben **BRANCH,** Trustee of Bank of New England Corporation

v.

**ERNST & YOUNG U.S., et al.**

**No. CIV.A. 93–10024–RGS.**

United States District Court, D. Massachusetts.

March 30, 2004.

---

Ellen S. Feldman, Thomas R. Kline, Thomas E. Starnes, Craig B. Young, Andrews & Kurth, D.C. Litigation, Washington, DC, James D. Higgason, Robin Russaell, Andrews & Kurth, Houston, TX, Dennis J. Kelly, Burns & Levinson, Boston, MA, Gary W. Smith, Postemak, Blankstein & Lund, Boston, Van Oliver, Andrews & Kurth, LLP, Dallas, TX, for Ben S. Branch, Plaintiff.

Kenneth M. Bernstein, Frances E. Bivens, Lynn E. Busath, Michael P. Carroll, Jennifer Rearden, Jewrome G. Snider, Davis, Polk & Wardwell, New York, NY, Patricia A. Connell, Ernst & Young LLP, New York, NY, Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom LLP, Boston, MA, for Ernst & Young, Ernst & Young U.S., Defendants.

Norman B Champ, III, Daniel F. Kolb, Jacqueline O. LiCalzi, Timothy J. Mayopoulos, Davis Polk & Wardwell, New York, NY, Ira K. Gross, Laura Steinberg, Sullivan & Worcester LLP, Boston, MA, Nancy Israel, Boston, MA, for Ernst & Young, Ernst & Young U.S., Alfred J. Corso, Edward Fraioli, Eugene F. McMahon, Jerry A. Felts, John F. Solan, Jr., Joseph Genovese, Kenneth I. Watchmaker, Kevin Nixon, Michael J. Doyle, Richard A. Young, Thomas L. Milan, Thomas R. Newman, Thomas Taylor, Tom McDermott, Defendants.

## MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

On October 7, 2002, Dr. Ben Branch, in his capacity as the Chapter 7 Bankruptcy Trustee of the failed Bank of New England Corporation (BNEC), sought a ruling by way of partial summary judgment that the correct method for determining whether BNEC and its largest subsidiary, Bank of New England, N.A. (BNENA),[1] were insolvent on September 29, 1989,[2] is the "fair market value" (or "balance sheet") test mandated by the Bankruptcy Code, 11 U.S.C. § 101(32)(A) ("[I]nsolvent means ... that the sum of [an] entity's debts is greater than all of [the] entity's property, at a fair valuation ....").[3] Under this test, an entity is valued not by its ability to meet its current obligations, but by the extent to which its "fairly valued" assets exceed its liabilities. *Farmers Bank of Clinton, Mo. v. Julian*, 383 F.2d 314, 326 (8th Cir.1967). "Fair value" is the negotiated price that a willing and sophisticated buyer would pay for an asset in an arm's-length transaction in which neither the buyer nor the seller is acting under tempo-

ral or financial duress. *In re Ouellette*, 98 F.Supp. 941, 942–943 (D.Me.1951). If the court agrees with the market value approach, Dr. Branch asks the court to find that his experts have correctly determined that BNENA was $2 billion in debt in September of 1989 when the errant bonds were offered.

On October 7, 2002, Ernst & Young filed a cross-motion arguing that the bankruptcy test has no relevance to the valuation of a national bank, and that the appropriate focus is on the viability of BNENA as a "going concern."[4] Because Ernst & Young's experts are of the opinion that BNENA was a viable entity as of the end of 1989,[5] they are also of the opinion that a hypothetical sale of the bank on the open market in September of 1989 (when conditions were better) would have earned a premium (or franchise value) on the theory that the whole is worth more than the sum of its parts, thereby demonstrating the bank's solvency.

On March 20, 2003, the court heard oral argument. Each of the parties took the predictable position that the other's experts had applied the wrong measure of valuation, thus erring on the issue of the bank's solvency on September 29, 1989.[6]

1. The court will refer to BNEC and BNENA collectively as the "bank."

2. Dr. Branch alleges that but for Ernst & Young's negligence in issuing an unqualified opinion and comfort letter attesting to the bank's financial health, the estate would not have been saddled with a $250 million debt incurred as the result of a September 1989 public bond offering, some $180 million of the proceeds of which were sucked into BNEC's failing subsidiary banks.

3. Dr. Branch filed a sur-reply two months after the briefing was complete, causing Ernst & Young to file a motion to strike the brief or in the alternative to be granted leave to file a response. The motion to strike is *DENIED*. The motion to file a response is *ALLOWED*.

4. Dr. Branch interprets this assertion to mean that Ernst & Young's experts have calculated

the bank's book value in such a way as to show an excess of assets over liabilities. This appears to be a generally accurate characterization, although Ernst & Young at times uses the term "going concern" more loosely to describe the prospective ability of the bank to generate a flow of cash from whatever source (including regulatory capital) sufficient to meet current obligations.

5. Ernst & Young's principal expert, Craig Elson, concluded that the market value of BNENA's assets exceeded its liabilities by $281 million at the end of 1989, while the fair value of the assets of BNEC's other subsidiary banks exceeded liabilities by $583 million.

6. Ernst & Young also seeks to preclude the testimony of Dr. Branch's principal expert witness, Richard Stover, under the "gatekeeping" rule of *Daubert v. Merrell Dow Pharma-*

After the hearing, the court allowed discovery to be taken in a related case, *Branch v. Hawke*, 03–CV–10192–RGS, for use in this litigation. On December 8, 2003, Ernst & Young filed a supplemental brief arguing that the discovery had revealed additional support for its position on the insolvency issue. According to Ernst & Young, one of Dr. Branch's expert witnesses, Dean Marriott, a former official of the Office of the Comptroller of the Currency (OCC), testified that OCC examiners had deemed BNENA solvent as of September 30, 1989.[7] Ernst & Young argues that Dr. Branch is now precluded from contradicting the OCC's "conclusive" finding. *See Mortgage Market, Inc. v. FDIC for Bankers Trust*, 780 F.Supp. 406, 407 (E.D.La.1991) ("Congress has appointed the OCC as the watchdog of national banks and has delegated to that agency the exclusive power to declare national banks insolvent and assign receivers.").

█ Dr. Branch, while conceding that the OCC has the paramount regulatory authority to determine whether a bank is operationally insolvent, argues (correctly, I believe) that the OCC's evaluation has no relevance to this case for three reasons. First, the OCC's determination whether to liquidate a bank is made using a book value approach, which calculates a bank's assets (principally its loan portfolio) as the sum of historical purchase prices less depreciation.[8] In a deepening insolvency case, by contrast, the law requires that the fair market valuation method be used. *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 349 (3rd Cir.2001). *See Corbin v. Franklin Nat'l Bank (In re Franklin Nat'l Bank Sec. Litigation)*, 2 B.R. 687, 712 (E.D.N.Y. 1979), *aff'd*, 633 F.2d 203 (2d Cir.1980) ("In this particular case it is fruitless to argue, as FDIC does, that book value has any meaning. If there were no purchasers or bidders for [the bank] in May and June 1974, its stock, realistically speaking, had no value and that meant that FNYC was insolvent . . .").[9] Second, the OCC's decision to close or not close a bank is influenced, as it was in the case of BNENA, by factors independent of the bank's financial

---

*ceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Ernst & Young argues that Stover failed to adequately investigate BNENA's loan portfolio before he discounted the value of individual loans and did not fully understand the "Forecast Summary" that he used to conduct his valuation. The motion is *DENIED*. While I understand Ernst & Young's criticism of the way in which Stover rated and marked down individual loans, I see nothing faulty in his choice of methodology. In any event, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky, but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

7. BNEC, as a holding company, was not regulated by the OCC.

8. Book value is "not ordinarily an accurate reflection of the market value of an asset."

*Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 36 (2d Cir.1996). This is not because of any accounting perversion. Rather, the book value method as used to value assets for purposes of preparing the financial statement of an operationally sound company serves a legitimate, but different purpose than does a market analysis in a liquidation context.

9. Similarly misplaced is Ernst & Young's inventive argument that the fair market valuation test set out in section 101(32) of the Bankruptcy Code cannot be used to value a national bank because banks cannot be debtors under the Bankruptcy Code. As Dr. Branch points out, the definition of insolvency applies to both debtors and non-debtors and that bankruptcy courts routinely apply the section 101(32) insolvency test to non-debtors in order to determine whether a fraudulent transfer has occurred or to determine the solvency of a third party who owes debts to the estate.

health as measured by its market value. Regulators take into account the impact of a bank failure on the national economy and the banking system as a whole, as well as the ability of the FDIC to manage the liquidation of the bank's assets. This is a different task than the determination of a bank's value for purposes of a sale. Third, while the OCC has the exclusive power to declare a federally chartered bank insolvent for liquidation purposes, the deference accorded to the OCC's book value determination applies only in that context. *See, e.g., James Madison Ltd. v. Ludwig,* 868 F.Supp. 3, 7 (D.D.C.1994).

█ The dispute thus comes full circle to the parties' original arguments over the proper methodology for valuing BNENA. While much ink has been shed on the issue, Dr. Branch does not disagree that a going concern analysis is part of any fairly conducted application of the fair market test.

> If, in the real world, selling the entity as a whole would generate the higher price, then that value is appropriate; if, in the real world, sale of the individual assets would raise more cash, then that amount controls. The choice between the two is unrelated to whether the entity is a "going concern" in the sense that it is cur-

rently operating; the determining factor is the reality of the market place, i.e., how much, if anything, would a buyer pay to acquire the entity as a whole? That question can only be answered by a careful study of the particular market's appetite for the specific assets in question . . . .

Plaintiff's Sur–Reply, at 2–3.[10] Hence, the critical assumption of Dr. Branch's experts—that there was no willing buyer for the bank in September of 1989 [11]—and their conclusion that the fair market test, correctly applied, demonstrates that the bank was insolvent.[12] Ernst & Young's experts, on the other hand, assume the contrary—that the bank could have been sold as a going concern at a premium that would have exceeded its accumulated debt. At bottom, this is not a dispute of law over differing valuation tests (despite the parties' refusal to recognize that they are singing contrapuntally from the same page), but a factual dispute over which side has picked the right assumption. Because Dr. Branch is correct that the proper valuation method in this case is the fair market test, so much of his motion as seeks the court's endorsement of this approach will be allowed, and the cross-motion of Ernst & Young, to the extent that it

10. Compare what Ernst & Young has to say on the subject. "It is because going concerns have greater value than the sum of their parts that bankruptcy valuation law requires an initial determination as to the viability of an entity and a valuation according to that status. It is not in the interests of the creditors generally for the assets to be sold at less than the full value that could be obtained in a prudent sale in a reasonable amount of time." Defendants' Opposition, at 9.

11. Dr. Branch summarizes his evidence on this point as follows. "In the fall of 1989, BNEC retained two preeminent investment banking firms—Goldman Sachs and Lazard Freres—who, contrary to [Ernst & Young's] colossal misstatement that only a 'few' poten-

tial buyers were solicited . . ., literally left no stone unturned in seeking an acquirer for all or some of the banks. . . . The record contains the exhaustive list *of over 255 potential purchasers* contacted by these two investment firms. . . . No one, however, would pay anything." Plaintiff's Sur–Reply, at 3–4 (emphasis in original).

12. Dr. Branch insists that his experts did take "going concern" into account. "Going concern valuation only relates to the period of time (a 'reasonable' period) over which the hypothetical liquidation takes place. . . . Because they allowed a reasonable period for the hypothetical sale, the Trustee's experts valued BNEC and BNENA as a going concern." Plaintiff's Response, at 9 n. 12.

can be read to contend otherwise, will be denied. Because the facts are not as unambiguous as each side would have it, the court declines to make a ruling as to whether the bank was or was not insolvent on September 29, 1989, but will leave that issue to the jury (or for disposition by way of a directed verdict depending on the evidence, or lack of evidence, offered at trial).

 Ernst & Young's motion for summary judgment on the issue of reliance will also be denied. While I agree with Ernst & Young that reliance is a necessary element of Dr. Branch's negligence and malpractice counts, I do not agree with the contention that Dr. Branch is obliged to produce testimony from a more senior member of BNEC's control group than Barry Barkley, the BNEC Controller responsible for financial reporting. Barkley, as I understand it, will testify that if Ernst & Young had not issued an unqualified opinion and comfort letter, the bond offering would not have gone forward. While this may be a delicate reed on which to rest the issue of reliance, it is sufficient to prick the bubble of summary judgment.[13]

### ORDER

For the foregoing reasons, Ernst & Young's motion for summary judgment on the insolvency issue is *DENIED*. Dr. Branch's motion for summary judgment on the insolvency issue is *ALLOWED* in part, as explained in the above memorandum. Ernst & Young's motion for summary judgment on the issue of reliance is *DENIED* in part, as explained in the above memorandum. Ernst & Young's motion to strike is *DENIED*. Ernst & Young's motion to file a response to Dr. Branch's surreply is *ALLOWED*. In anticipation of trial, the parties will within twenty-one

(21) days of the date of this Order submit a joint estimate of the number of jury days they anticipate a trial will require, together with proposed trial dates mutually convenient to the parties and witnesses. The court reserves the option of setting time limits on the trial of the case, if it deems that such limits are appropriate.

SO ORDERED.

---

13. The court will schedule a pretrial hearing on the issue of causation as an aid in the preparation of appropriate jury instructions on the subject. The cross-motions for summary judgment on the issue of causation will in the interim be *DENIED* without prejudice.