RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0321p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re: NM HOLDINGS COMPANY, LLC et al.,
                                        *Debtors.*

_____

STUART A. GOLD, Chapter 7 Trustee of NM
Holdings Company LLC (f/k/a Venture
Holdings Company, LLC), NM EMCO, INC.,
NM INDUSTRIES CORPORATION, NM MOLD &
ENGINEERING CORPORATION, NM OLD
LEASING COMPANY, NM NEMCO LEASING,
INC., NM HOLDINGS CORPORATION, NM
SERVICE COMPANY, NM EXP LLC, and NM
EU CORPORATION,
                          *Plaintiffs-Appellants,*


           *v.*


DELOITTE & TOUCHE LLP,
                          *Defendant-Appellee.*

No. 09-1870

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 08-15283—Marianne O. Battani, District Judge.

Argued: July 29, 2010

Decided and Filed: September 30, 2010

Before: GILMAN and WHITE, Circuit Judges; WATSON, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Gregory D. Hanley, KICKHAM HANLEY PLLC, Royal Oak, Michigan,
for Appellants. John F. Hartmann, P.C., KIRKLAND & ELLIS LLP, Chicago, Illinois,
for Appellee. **ON BRIEF:** Gregory D. Hanley, Timothy O. McMahon, KICKHAM

_____

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of
Ohio, sitting by designation.

HANLEY PLLC, Royal Oak, Michigan, for Appellants.  John F. Hartmann, P.C., Mark S. Hamill, KIRKLAND & ELLIS LLP, Chicago, Illinois, for Appellee.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge.   Stuart Gold, as the trustee in bankruptcy for a group of companies collectively known as Venture, sued Deloitte & Touche LLP, Venture's former auditor, alleging that Deloitte (1) negligently performed its audits by failing to uncover and report unsound related-party transactions entered into by Venture's sole shareholder and CEO, and (2) aided and abetted the CEO's breach of his fiduciary duty to Venture.  Deloitte filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the basis that Gold had failed to state a claim upon which relief can be granted.

The district court granted Deloitte's motion.  It held that Gold's claim against Deloitte for professional negligence failed because Michigan's "sole-actor rule" prevented Gold from establishing that Venture relied on Deloitte's audits.  In addition, the court held that Gold's claim that Deloitte aided and abetted the CEO's breach of his fiduciary duty to Venture was barred by Michigan's three-year statute of limitations applicable to such claims.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.     Factual background

The following facts are taken primarily from Gold's first amended complaint. Venture was an automotive-parts supplier that filed for Chapter 11 bankruptcy in March 2003.  In January 2006, its bankruptcy proceeding was converted into a Chapter 7 liquidation.  Gold was appointed as the Chapter 7 trustee for Venture later that same month.

All of the equity interest in Venture was held by Venture Holdings Trust, with Larry Winget being the Trust's sole beneficiary. Winget was also the CEO and a director of Venture. (Although the complaint states that Winget was "a" director of Venture rather than the sole director, there is nothing in the complaint, the parties' briefs, or the district court's opinion that makes any reference to the existence or authority of any other Venture directors.)

For a number of years before Venture filed for bankruptcy, Winget allegedly caused Venture to enter into a series of transactions with companies that were wholly owned or controlled by Winget. According to the complaint, "Venture received little or no consideration and/or less than reasonably equivalent value in these related party transactions." The complaint also alleged that Venture's public financial statements "contained false and materially misleading statements and information about the numerous related party transactions . . . . Many of the related party transactions were not disclosed at all, and, as to those that were partially disclosed, the financial statements falsely stated that the transactions were fair to Venture from a financial standpoint."

Beginning in 1987, Deloitte was retained by Venture to conduct annual audits and quarterly reviews of Venture's financial statements. In conducting its audits, Deloitte allegedly violated Generally Accepted Auditing Standards (GAAS) by failing (1) to properly design its audits in order to determine whether Venture's financial statements contained false statements, (2) to utilize appropriate procedures for analyzing related-party transactions, and (3) to properly qualify its opinions on Venture's financial statements from 1995 until 2001. Deloitte had repeatedly issued unqualified opinions stating that Venture's public financial statements fairly presented the financial condition of the company. Venture's statements in fact contained false and misleading information regarding the related-party transactions.

Gold also alleged that Deloitte knew of Winget's impropriety in entering into the related-party transactions. For example, an internal Deloitte memorandum purportedly acknowledged that a transaction between Venture and a related company

was not a "commission agreement," even though that is how the transaction was characterized in Venture's financial statements.

Finally, Gold claimed that Deloitte's auditing failures were the proximate cause of Venture's precarious financial situation and ultimate bankruptcy. Venture had entered into several loan agreements that by their terms restricted Venture's ability to engage in related-party transactions and required the company to comply with various financial-reporting obligations. According to Gold, if Deloitte had properly performed its function, then Venture's creditors would have known about the related-party transactions and would have forced Venture to cure the default, thus compelling Winget to stop engaging in the harmful transactions. If Winget had done so, "Venture's financial condition would have been more favorable than it actually was, even if it still had entered bankruptcy."

Gold also alleged that Venture's independent "Fairness Committee," which was established pursuant to one or more of the loan agreements, was similarly unaware of the harmful transactions and would have acted to stop Winget had it been informed of them. The Fairness Committee consisted of a "sole and independent member" who had the authority to prevent Winget from entering into any related-party transactions. If Venture had fired this committee member, it would have been in breach of the loan agreements.

**B.     Procedural history**

In March 2006, Gold filed suit against Deloitte in a Michigan state court. Deloitte then removed the case to the United States Bankruptcy Court for the Eastern District of Michigan. Gold's first amended complaint was filed in August 2007. He asserted four claims against Deloitte. In Count I, Gold claimed that Deloitte committed professional negligence by failing to properly conduct its audits. Specifically, Gold alleged that Deloitte breached its duty to Venture to conduct the audits in accordance with GAAS and that this breach directly and proximately injured Venture.

Gold claimed in Count II that Deloitte, by failing to disclose related-party transactions that it had knowledge of, aided and abetted Winget in breaching the

fiduciary duty that Winget owed to Venture. Count III, which was titled "Disgorgement of Fees," alleged that Deloitte was unjustly enriched by collecting fees for its services and that it should have to disgorge all fees that it received for performing the audits.

Finally, in Count IV, Gold alleged that any payments transferred to Deloitte once Venture became insolvent were fraudulent and thus recoverable by Gold. This last claim was brought pursuant to both § 548 of the Bankruptcy Code, 11 U.S.C. § 548, and Michigan's fraudulent-transfer statute, Mich. Comp. Laws. Ann. § 566.31 *et seq*. Gold's first three claims were brought solely under Michigan common law.

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Deloitte filed a motion in September 2007 to dismiss Gold's first amended complaint for failure to state a claim upon which relief can be granted. Deloitte argued that (1) Gold's claims could not succeed as a matter of law because the complaint alleged reliance only by Venture's creditors, not Venture itself, (2) Gold's recovery was barred by Michigan's wrongful-conduct rule, (3) all of Gold's claims were barred by the applicable statute of limitations, and (4) Gold's aiding-and-abetting claim failed because the complaint did not contain facts establishing that Deloitte knowingly provided substantial assistance to Winget.

After a hearing, the bankruptcy judge issued a recommendation that the district court dismiss Counts I through III. He did so pursuant to 28 U.S.C. § 157(c)(1), which provides as follows:

> A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

The bankruptcy judge recommended that the district court dismiss Count I because Gold did not allege that Venture relied on Deloitte's opinions, which is a necessary component of the causation element in a professional-negligence claim. Next,

the bankruptcy judge recommended that the district court find that Count II was time-barred by the three-year statute of limitations found in Mich. Comp. Laws Ann. § 600.5805(10).

As to Count III, the bankruptcy judge recommended dismissal because the disgorgement of fees is simply a remedy, not a separate claim for relief. Gold did not object to the dismissal of Count III so long as disgorgement remained a potential remedy against Deloitte if liability was established. Count III was thus not at issue before the district court.

Finally, the bankruptcy judge granted Deloitte's motion as to Count IV (fraudulent transfers) after it found the claim to be time-barred. The judge was able to enter a final order on Count IV because it was a "core proceeding" under 28 U.S.C. § 157(b)(2)(H), which provides that "proceedings to . . . recover fraudulent conveyances" are core proceedings and thus may be determined by a bankruptcy judge. This dismissal was challenged in a separate proceeding before the district court, which affirmed the bankruptcy judge's dismissal. Gold has not appealed the dismissal of Count IV, leaving Counts I (professional negligence) and II (aiding and abetting) as those still in contention.

The district court accepted the bankruptcy judge's recommendations on Counts I and II, entering an order that dismissed these counts in June 2009. This timely appeal followed.

## II. ANALYSIS

### A.      Standard of review and applicable substantive law

We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Lambert v. Hartman*, 517 F.3d 433, 438-39 (6th Cir. 2008). When deciding such a motion, we must construe the complaint in the light most favorable to the plaintiff and must accept all of the factual allegations contained in the complaint as true. *Id*. at 439. The complaint must show legal entitlement to relief in order to survive a Rule 12(b)(6) motion to dismiss. *Id*. This

standard is met where the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Although Venture's bankruptcy proceeding establishes federal jurisdiction in this case, *see* 28 U.S.C. § 1334(b), Gold's remaining claims—Count I and Count II—are brought pursuant to state law. The parties agree that Michigan law is controlling as to both of these counts.

**B.          Count I: Professional negligence**

In Count I, Gold alleged that Deloitte committed professional negligence by failing to properly conduct its audits of Venture. In order to succeed on a professional-negligence claim, Gold must satisfy four elements: (1) a duty owed by Deloitte to Venture, (2) a breach of that duty, (3) causation, and (4) damages. *See Haliw v. Sterling Heights*, 627 N.W.2d 581, 588 (Mich. 2001). The causation element is the source of the instant dispute between the parties. Following the recommendation of the bankruptcy judge, the district court held that Gold's claim failed as a matter of law because Venture could not have relied on Deloitte's audits where the actions of Winget are imputed to Venture by way of Michigan's sole-actor rule. Without reliance, Deloitte's alleged inadequate performance could not have caused the harm to Venture.

Gold argues that this holding is erroneous because (1) reliance is not an element of a professional-negligence claim under Michigan law, (2) even if reliance is required, Venture's Fairness Committee relied on the audits, and (3) Venture's creditors also relied on the audits. Each argument is addressed in turn below.

*1.          Reliance as a component of causation*

In a professional-negligence case,

> [p]roof of causation requires both cause in fact and legal, or proximate, cause. Cause in fact requires that the harmful result would not have come about but for the defendant's negligent conduct. On the other hand, legal cause or "proximate cause" normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences.

*Haliw*, 627 N.W.2d at 588 (citations and internal quotation marks omitted).  Although Gold is correct in pointing out that reliance is not per se an element of professional negligence, proof of reliance is necessary here in order to show that Deloitte's allegedly deficient audits were the cause in fact of Venture's tenuous financial position and resulting bankruptcy.  If no Venture insider was lulled by the audits in failing to detect the related-party transactions, then the harm to Venture would have come about even in the absence of Deloitte's conduct.  *See FDIC v. Ernst & Young*, 967 F.2d 166, 170 (5th Cir. 1992) (holding that "if nobody relied upon the audit, then the audit could not have been" the cause in fact of the harm).

This conclusion is consistent with the holdings of many other courts that have examined the issue.  *See id.* (stating that, in a professional-negligence action against an auditor, "a claim that reliance is not a component of causation strains credulity"); *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 964 (9th Cir. 1990) (affirming a grant of summary judgment in favor of the auditor in a professional-negligence case, stating that the plaintiffs "must present some evidence establishing the element of causation, in the sense of actual and justifiable reliance upon misrepresentations or omissions of material fact, to avoid summary judgment"); *Branch v. Ernst & Young U.S.*, 311 F. Supp. 2d 179, 184 (D. Mass. 2004) (stating that "reliance is a necessary element of [the plaintiff's] negligence and malpractice counts" against an auditor); *Resolution Trust Corp. v. Coopers & Lybrand*, 915 F. Supp. 584, 588 (S.D.N.Y. 1996) ("If no one relies on an audit, then presumably it could not be a substantial factor in causing an injury."); *PNC Bank, Ky., Inc. v. Hous. Mortgage Corp.*, 899 F. Supp. 1399, 1403 (W.D. Pa. 1994) ("Thus, if [the accounting firm] can establish, based upon the pleadings and admissions on file, that [the plaintiff] did not rely upon the audits in conducting its affairs, then it will be entitled to dismissal of [the plaintiff's] claims for negligence.").

In response, Gold cites *Allard v. Arthur Andersen & Co.*, 924 F. Supp 488 (S.D.N.Y. 1996), for the proposition that Michigan law does not require proof of reliance in a professional-negligence claim. There, the district court in New York applied Michigan law to analyze a motion for summary judgment in a professional-negligence

action brought by a corporation's trustee in bankruptcy against the corporation's auditors. The auditor argued that the corporation was barred from recovering on its malpractice claim because the intentional conduct of the corporation's CEO in siphoning money from the corporation should be imputed to the corporation. *Id*. at 494. In denying summary judgment because questions of fact remained as to whether the CEO's actions were wholly adverse to the company, the court held that the issue of imputation should be decided at trial:

> Generally, under both New York and Michigan law, the knowledge and conduct of corporate officials acting within the scope of their duties are imputed to the corporation. However, when a corporate agent has totally abandoned his principal's interests and [acts] entirely for his own or another's purposes, there is no imputation under the adverse interest exception to the general rule.

The court continued:

> If it is determined at trial that imputation is appropriate here notwithstanding the adverse interest exception, that imputation will bar recovery by the Trustee on his fraud claims because access to the truth renders reliance on representations to the contrary unreasonable as a matter of law. However, imputation would not necessarily operate as a complete bar to the Trustee's negligence and malpractice claims, because both New York and Michigan are comparative negligence jurisdictions.

*Id*. at 494-95 (citations and internal quotation marks omitted).

Gold contends that this last paragraph by the court in *Allard* recognizes that negligence and malpractice claims do not require a showing of reliance by the plaintiff. We respectfully disagree. Concluding that "access to the truth renders reliance on representations to the contrary unreasonable" is hardly a repudiation of reliance as an element of causation. And the second sentence of the paragraph addresses comparative negligence rather than causation. The quoted language does not negate that some type of innocent reliance is necessary to establish causation in fact; it simply observes that, due to comparative negligence, imputed knowledge may not be a complete bar to recovery. Imputed knowledge and innocent reliance are not necessarily mutually exclusive. Moreover, these brief statements are dicta because the *Allard* court's holding

turned on the factual question of whether the CEO's actions were wholly adverse to the company, not on whether the trustee's complaint adequately alleged causation. In sum, we conclude that *Allard* is not persuasive for the point argued. The district court therefore did not err in holding that reliance is a critical part of establishing causation in this professional-negligence action.

### 2.     *Imputation analysis*

Under Michigan law, the knowledge of a corporate agent can be imputed to the entire corporation:

> A corporation can only act through its employees and, consequently, the acts of its employees, within the scope of their employment, constitute the acts of the corporation. Likewise, knowledge acquired by employees within the scope of their employment is imputed to the corporation. In consequence, a corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual employee who then would have comprehended its full import. Rather, the corporation is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly.

*Upjohn Co. v. N.H. Ins. Co.*, 476 N.W.2d 392, 400 (Mich. 1991) (citation omitted). This general imputation rule applies where the corporate officer acts in the course of his or her employment and for the benefit of the corporation. *MCA Fin. Corp. v. Grant Thornton, L.L.P.*, 687 N.W.2d 850, 857 (Mich. Ct. App. 2004).

An exception to the imputation rule, however, provides that "the corporate officer's actions will not be deemed to have been done for the benefit of the corporation if the actions were adverse to the corporation's interests." *Id.*; *see also New Properties, Inc. v. George D. Newpower, Jr., Inc.*, 762 N.W.2d 178, 188 (Mich. Ct. App. 2009) ("The general rule which imputes an agent's knowledge to his principal is subject to an exception where the agent acts in his own interest, adversely to his principal." (citation omitted)). The adverse-interest exception, however, itself has an exception:

> The sole actor rule is an exception to the adverse interest exception . . . .
> The sole actor rule comes into play where the wrongdoer is, in essence,

the corporation (the "sole actor"). Indeed, it has its roots in cases where the agent and the principal are literally the same person (literally a "sole actor") and thus information obtained by a person in his role as an agent is treated as also being obtained in his role as principal, even if his activities as agent are contrary to his interests as a principal. Therefore, where the wrongdoer acts contrary to the interests of the corporation, under the adverse interest exception the wrongdoer's conduct would not ordinarily be imputed to the corporation. But where the wrongdoer is a sole actor, the adverse interest exception is not applied and his wrongdoing is nevertheless imputed to the corporation.

*MCA Fin. Corp.*, 687 N.W.2d at 860. Thus, for example, "where a sole shareholder loots the corporation of its assets[,] the adverse interest exception will not apply." *Id.*

We pause to note Gold's argument that a court cannot undertake the imputation analysis without first applying Michigan's wrongful-conduct rule, which "precludes a plaintiff from recovering on a claim that is based on the plaintiff's own wrongdoing." *Id.* at 853. In other words, Gold claims that the only actions that can be imputed to a corporation are those that are deemed wrongful by this common law rule. He then proceeds to argue that the wrongful-conduct rule does not apply to bar Venture's recovery because, among other things, Winget's conduct was not "prohibited or almost entirely prohibited under a penal or criminal statute." *See Orzel v. Scott Drugs Co.*, 537 N.W.2d 208, 214 (Mich. 1995) (holding that a plaintiff's claim that a pharmacy negligently supplied him with a controlled substance was barred because the harm was caused, at least in part, by the plaintiff's illegal conduct).

This argument is contradicted by the caselaw cited above that explicitly acknowledges that courts can impute a corporate agent's *knowledge* in addition to an agent's wrongful conduct. And the only case cited by Gold to support his argument regarding the proper order of analysis, *MCA Financial*, is distinguishable. In that case, the Michigan Court of Appeals first held that the wrongful-conduct rule applied to the actions of individual officers of the corporation. Next, the court went on to hold that the wrongful conduct of these officers would be imputed to the entire corporation, thus barring the corporation from recovering on its claims against its former auditor. *MCA Fin. Corp.*, 687 N.W.2d at 857-61.

To argue, however, that *MCA Financial* stands for the proposition that imputation can occur *only* if the wrongful-conduct rule applies is inaccurate. Indeed, the Michigan Supreme Court has applied the imputation rule without undertaking a wrongful-conduct analysis. In *National Turners Building & Loan Ass'n v. Schreitmueller*, 285 N.W. 497 (Mich. 1939), which appears to be the earliest Michigan case applying the sole-actor rule, the Court held that a corporate agent's knowledge should be imputed to the corporation where the agent issued a fraudulent stock certificate to an investor. The corporation thus could not seek to cancel the stock certificate because "[i]f a corporation is so lax as to trust the whole of a transaction to one officer, it should suffer the consequences of his misfeasance as an officer." *Id.* at 499. Importantly, the Court undertook the imputation analysis, *see id.* at 499-500, without any mention of the wrongful-conduct rule, which was solidly in place in Michigan at the time of the Court's decision. *See, e.g.*, *Garwols v. Bankers' Trust Co.*, 232 N.W. 239, 240-42 (Mich. 1930); *McDonald v. Hall*, 159 N.W. 358, 362 (Mich. 1916). Gold's argument that imputation can occur only where the wrongful-conduct rule applies is thus without merit.

Returning now to the imputation analysis, we note that Gold alleges that Winget used his power as CEO to cause Venture to enter into the related-party transactions. This allegation meets the threshold requirement for the imputation rule. But Gold also alleges that Winget's transactions were "solely in his own interest and entirely against the interests of Venture," which implicates the adverse-interest exception. Deloitte responds by arguing that Winget was clearly the sole actor because he was the CEO and sole shareholder of Venture. *See In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997) ("Where, as here, a sole shareholder is alleged to have stripped the corporation of assets, the adverse interest exception to the presumption of knowledge cannot apply."), *cited in MCA Fin. Corp.*, 687 N.W.2d at 860 n.28.

And Gold does not seriously dispute that Winget was the sole actor through this point in the imputation analysis. Indeed, at oral argument, Gold's counsel conceded that the sole-actor rule would be applicable but for the "innocent-decisionmaker exception"

to the sole-actor rule. This exception was most clearly articulated in *In re Sharp International Corp.*, 278 B.R. 28, 39 (Bankr. E.D.N.Y. 2002), where the court declined to apply the sole-actor rule to impute the knowledge of Sharp's CEO in perpetrating a fraud to the corporation because the complaint alleged "the presence of a person with the ability to bring an end to the fraudulent activity at issue." *Id.* That is, there was "an innocent 13% shareholder who served on Sharp's board of directors, served as a consultant to Sharp, regularly visited Sharp's offices, and regularly received and reviewed financial statements," and who "could or would have prevented the fraud had he known about it." *Id.* at 37, 39. These allegations were deemed sufficient to defeat the applicability of the sole-actor exception.

Here, Gold contends that Venture's creditors and the Fairness Committee were innocent decision-makers because they had the authority to stop Winget from entering into the related-party transactions. He argues that given the presence of these innocent parties, Winget cannot be considered to be Venture's sole actor, meaning that Winget's knowledge should not be imputed to Venture so as to bar any recovery by Venture.

We first note that no Michigan court has thus far adopted the innocent-decision-maker exception. *See MCA Fin. Corp.*, 687 N.W.2d at 861 (stating that the court "need not consider whether to apply the *Sharp* exception to the sole actor rule"). Nonetheless, as explained below, Gold still fails to state a claim for relief even if the Michigan courts would apply the innocent-decision-maker exception in the imputation context.

### 3.      *Alleged reliance by the Fairness Committee*

The relevant allegations in the first amended complaint regarding Venture's Fairness Committee are as follows:

> 312.    Section 4.12 of [the NBD loan indenture agreement] . . . required the formation of a "Fairness Committee" to review related party transactions. The Indentures required at least one member of the Fairness Committee to be independent of Venture and its principals, which independent member effectively wielded veto power over related party transactions.
>
> . . .

320.    Not only would timely and proper disclosure of these transactions have caused NBD, the noteholders and indenture trustees to force Winget to cease the unfair related party transactions, but . . . such disclosures would have caused the independent member of the Fairness Committee to act to avoid or at the very least reduce the corporate injury suffered by Venture as a result of Winget's improper related party transactions.

321.    As required under certain of its indentures and loan agreements . . . , Venture maintained a Fairness Committee, which had a sole and independent member, Maurice Williams, who was empowered to evaluate and approve or disapprove of any related party transactions undertaken by Winget.  Because Venture was required to retain an independent member of the Fairness Committee, Mr. Williams . . . could not be terminated at the whim of Winget without placing Venture in default under various agreements.  In this capacity, Mr. Williams possessed greater corporate power than an officer or director of Venture, because he had the unilateral and absolute authority to prevent Winget from undertaking or continuing any unfair related party transactions.  On information and belief, Mr. Williams was innocent of Winget's misconduct . . . , and was able to prevent it had the misconduct been known.

322.    Deloitte was fully aware of the existence and powers of the Fairness Committee.  Deloitte obtained minutes of the meetings of the Fairness Committee, knew of Mr. Williams' identity and role, and was fully able to communicate with Mr. Williams about the related party transactions it was auditing.

Even assuming (without deciding) that these allegations are enough to state a claim that Williams was an innocent decision-maker who could prevent Winget's knowledge from being imputed to Venture, the allegations are insufficient in a critical way:  They contain no statement that Williams actually relied on Deloittes's audits in choosing not to act. Even more fundamental, there is no allegation that Williams ever saw the audits.

The amended complaint does allege that properly conducted audits "would have caused the independent member of the Fairness Committee to act," but this statement is, at most, a mere "formulaic recitation" of the causation element of a professional-negligence claim and is not sufficient to state a claim for relief.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citation omitted) (holding that the plaintiff's complaint failed to state a claim for relief because it contained conclusory allegations that were not

entitled to the assumption of truth). An allegation that Williams in fact saw and relied on the audits would be the "further factual enhancement" that is needed to support this "naked assertion." *See id.* (citation omitted). In sum, Gold's amended complaint can hardly "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" if it does not even allege that Williams saw the audits. *See id.* (citation and internal quotation marks omitted).

This deficiency is especially glaring in comparison to the explicit statements regarding creditor reliance. The amended complaint, for example, alleged that Deloitte "issued certain opinions directly to NBD Bank and to the noteholders," that "Venture was obligated to supply audited financial statements to the noteholders," and that Deloitte "directly reported" to Venture's creditors. In addition, the amended complaint alleged that Deloitte specifically represented to the creditors "that it was not aware of any violation of applicable covenants, including covenants prohibiting Venture from making distributions to Winget." Most importantly, the amended complaint alleged that "the noteholders relied upon Deloitte's representations in determining whether Venture was in compliance with the covenants set forth in the indenture." These specific allegations of creditor reliance are in sharp contrast to the allegations regarding the Fairness Committee.

Particularly striking is the fact that Gold amended his complaint to add specific examples of creditor reliance. In Gold's original complaint, there were no allegations of reliance on the audits by anyone. Deloitte subsequently filed a motion to dismiss Gold's original complaint, arguing that because the complaint did not (and could not) allege that Venture itself relied on the audits, Gold had failed to state a claim. Presumably in response to this contention, Gold amended his complaint to add allegations of reliance. These new allegations, however, related only to reliance by Venture creditors, not by Williams as the sole member of the Fairness Committee.

Williams, in other words, might or might not be considered an innocent decision-maker within Venture for the purpose of overcoming the sole-actor rule. But without any allegations that Williams relied on Deloitte's audits, Gold has failed to satisfy the

causation element for a professional-negligence claim even if Williams were so considered.

### *4.     Alleged reliance by creditors*

Gold's final argument related to Count I is that the amended complaint alleges reliance on the audits by Venture's creditors. According to Gold, this reliance would establish causation. He also claims that the creditors acted as innocent decision-makers, thus keeping Winget's knowledge from being imputed to Venture. In analyzing this third-party reliance argument, we must bear in mind Gold's role as the trustee in bankruptcy for Venture. The key point is that "a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991). Gold, in other words, represents Venture, not Venture's creditors.

The Fifth Circuit directly faced the issue of third-party reliance in *FDIC v. Ernst & Young*, 967 F.2d 166 (5th Cir. 1992). In that case, Western Savings Association was in a precarious financial condition because its sole shareholder, Jarrett Woods, had entered into "unsafe and unsound" ventures. *Id*. at 168. As a result, federal regulators required Western to undergo an outside review of its financial condition. Ernst & Young (EY) subsequently certified that Western was in a strong financial condition when, in fact, it was insolvent. The FDIC was the assignee of Western after the latter's assets were placed in the Federal Savings and Loan Insurance Corporation Resolution Fund. As assignee, the FDIC sued EY, alleging professional negligence.

After noting that reliance is a necessary element for such a claim, the court stated that the issue before it was "whether either Woods or Western relied upon [EY's] audit to cause injury to Western." *Id*. at 170. The court held that, under the imputation rule, Woods's knowledge was imputable to Western, so neither could have relied on the audit. *Id*. at 171.

The court then rejected the FDIC's alleged cause of action based on the argument that third parties had relied on the audits:

> The FDIC argues that even if neither Woods nor Western relied upon the audit, [EY's] alleged negligence caused the losses because had the audits been accurate, someone, such as Western's creditors or government regulators, would have "rescued" Western. This argument is flawed because it is not an appropriate argument for Western, or its assignee, to make. Western cannot claim it should recover from EY for not being rescued by a third party for something Western was already aware of and chose to ignore. Neither can Western's assignee make the claim. The FDIC in its own capacity or Western's creditors might be able to make this claim, but the FDIC brought this suit only on Western's behalf.
>
> Assuming, for the sake of argument, that [EY] negligently audited Western's books, we do not hold that EY can never be held liable for its negligence. Either Western's creditors or the FDIC on its own behalf may have a cause of action against EY. Moreover, we are not holding that an auditor is never liable to a corporation when a corporation's employee or agent acts fraudulently on the corporation's behalf. We limit our holding narrowly to the facts of this case under Texas law—i.e. the FDIC, as assignee of a corporation with a dominating sole owner, sues an auditor for negligently performing an audit upon which neither the owner nor the corporation relied.

*Id*. at 171-72; *see also Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lyrband, LLP*, 322 F.3d 147, 165-66 (2d Cir. 2003) (rejecting an argument that the corporation's creditors or underwriter could have acted as innocent insiders and could have rescued the company from the fraudulent transaction, reasoning that such third-party reliance is "legally irrelevant" to a claim by the trustee in bankruptcy).

The argument that Gold makes in the present case is essentially the same as that made by EY. Perhaps Venture's creditors could have prevented Winget from continuing to enter into related-party transactions had they known about them. But this is not an appropriate claim for Gold (who stands in the shoes of Venture) to make. As Deloitte points out, Gold is attempting to combine reliance by the creditors with the harm suffered by Venture to establish a claim brought by Venture against Deloitte. We conclude that the reasoning of the Fifth Circuit in *Ernst & Young* is sound, and hold that

third-party reliance of this type is insufficient to establish causation in a professional-negligence action.

In sum, Gold's amended complaint does not allege reliance by Venture or by Venture's Fairness Committee. And the alleged reliance by Venture's creditors cannot support a claim brought by Gold on behalf of Venture. The district court thus did not err in dismissing Count I of Gold's amended complaint for failure to state a claim.

## C.          Count II: Aiding and abetting the breach of a fiduciary duty

Turning now to Count II, Gold alleged that by "knowingly failing to disclose" the nature of the related-party transactions and by improperly issuing unqualified opinions, Deloitte aided and abetted Winget in his breach of his fiduciary duty owed to Venture. The district court held that this claim was covered by the residual three-year statute of limitations for tort claims contained in Mich. Comp. Laws Ann. § 600.5805(10), which states that "[t]he period of limitations is 3 years after the time of the death or injury for all other actions to recover damages for the death of a person, or for injury to a person or property." It further concluded that the claim accrued when Venture filed for bankruptcy on March 28, 2003. Because Gold did not file suit against Deloitte until March 31, 2006, the claim was held to be time-barred. In so holding, the court reasoned that the statute of limitations for professional-negligence actions did not apply because the type of interest harmed in such an action was different:

> [I]n Gold's claim that Deloitte aided and abetted Winget's breach . . . , the interest harmed was Venture's interest in Winget's performance of his fiduciary duties. . . . Gold is not claiming that it was harmed due to Deloitte violating some duty it owed to Venture itself, which would be required for a negligence or malpractice claim.

Gold contends that this conclusion is erroneous. He argues instead that the two-year statute of limitations in Mich. Comp. Laws Ann. § 600.5805(6), which applies to "an action charging malpractice," governs Count II. Although the statute of limitations period is shorter for a malpractice claim, the action would not accrue until Deloitte "discontinue[d] serving [Venture] in a professional . . . capacity." *See* Mich. Comp.

Laws Ann. § 600.5838(1). Gold contends that because Deloitte did not discontinue its service to Venture until May 4, 2004 (at the earliest), his aiding-and-abetting claim is not time-barred. He reasons that the aiding-and-abetting claim "sounds in malpractice regardless of the label attached to the claim," and that "Deloitte's duty to not aid and abet Winget[] . . . [is] the subject of the aiding and abetting claim. Winget's breaches of his duties are not the source of Deloitte's liability."

Deloitte, on the other hand, contends that the district court was correct in its application of the three-year statute of limitations to Count II. It reasons that the elements of an aiding-and-abetting claim "go well beyond" the elements of a professional-negligence claim, making the two claims separate and distinct.

In Michigan, "[t]he type of interest allegedly harmed is the focal point in determining which limitation period controls." *Aldred v. O'Hara-Bruce*, 458 N.W.2d 671, 672 (Mich. Ct. App. 1990); *see id.* at 673 (holding that the plaintiff's claim was one of attorney malpractice, not breach of contract, because "damages flowed not from defendant's failure to represent their son, but from her failure to do so adequately"). There are at least two potential interests that could have been harmed if Deloitte aided and abetted Winget. First, Venture had an interest in having Deloitte adequately perform the audits. Venture had a second interest in having Winget properly perform his fiduciary duty by not looting the company. The interest that was ultimately harmed by Deloitte's alleged aiding and abetting was the interest that Venture had in having Winget properly perform his fiduciary duties. This is different from the interest harmed in a professional-negligence claim—the interest that a client has in receiving adequate performance by the outside professional.

Moreover, the nature of an aiding-and-abetting claim is different. *See Tenneco Inc. v. Amerisure Mut. Ins. Co.*, 761 N.W.2d 846, 864 (Mich. Ct. App. 2008) ("The true nature of a plaintiff's claim must be examined to determine the applicable statute of limitations."). In an aiding-and-abetting claim, the defendant is helping *someone else* commit the primary wrong. This is fundamentally different from a malpractice claim, in which the primary wrong is committed by the defendant itself.

The elements of the cause of action are also different. In order to establish a claim of aiding and abetting the breach of a fiduciary duty, Gold would need to prove that (1) Winget breached his duty to Venture, (2) Deloitte knew that Winget's conduct constituted a breach of his duty to Venture, and (3) Deloitte gave "substantial assistance or encouragement" to Winget "so to conduct himself." *See Restatement (Second) of Torts* § 876(b), *cited in Carson Fischer, PLC v. Standard Fed. Bank*, Nos. 248125, 248167, 2005 WL 292343, at *6 (Mich. Ct. App. 2005), *reversed on other grounds by* 713 N.W.2d 265 (Mich. 2006).

The differences between an aiding-and-abetting claim and a professional-negligence claim are thus substantial. For the former cause of action, there is no requirement that Deloitte owed any duty to Venture. But Gold would need to establish that Deloitte provided substantial assistance or encouragement to Winget in breaching the latter's fiduciary duty to the company. Most importantly, an aiding-and-abetting claim requires proof that Deloitte acted *knowingly*, whereas a professional-negligence claim requires proof of only negligent behavior. Given the differences in the interests harmed, as well as the differences in the nature and elements of these two types of claims, the district court did not err in holding that the residual statute of limitations applied to Gold's aiding-and-abetting claim.

Gold has also failed to cite a single case where a Michigan court has applied the professional-negligence statute of limitations to an aiding-and-abetting claim. The primary case cited by Gold on this issue, *Alken-Ziegler, Inc. v. George Bearup, Smith, Haughey, Rice & Roegge, P.C.*, No. 264513, 2006 WL 572571 (Mich. Ct. App. 2006), is easily distinguishable. The corporate plaintiff in *Alken-Ziegler* filed suit against its former attorneys, arguing that they committed malpractice by failing to appeal an order and committed breach of contract where the contract provided that the attorneys would appeal. *Id*. at *1. The court first concluded that the corporation's malpractice claim was time-barred. *Id*. at *2. Although the corporation then argued that its breach-of-contract claim was distinct from its malpractice claim, and thus subject to a separate statute of limitations, the court disagreed:

> [C]laims against attorneys brought on the basis of inadequate representation sound in tort and are governed by the malpractice statute of limitations, even though a plaintiff may assert that the attorney's actions breached a contract. Attorneys may be held liable under a contract theory, but only when it is shown that the attorney breached a special agreement rather than a general agreement to provide requisite skill or adequate legal services. A special agreement is a contract to perform a specific act, as opposed to a general agreement to exercise appropriate legal skill in providing representation in a lawsuit.

*Id.* at \*3 (citations and internal quotation marks omitted).

*Alken-Ziegler* does not support Gold's argument. The primary thrust behind the court's opinion in *Alken-Ziegler* was that both of the corporation's claims were based on allegations of inadequate representation. *Id.* Both were deemed similar enough to fall within the malpractice statute of limitations. Here, Gold's aiding-and-abetting claim is not based on an allegation that Deloitte breached its duty to Venture, but rather that Winget breached his duty to Venture and that Deloitte knowingly provided substantial assistance to help him do so. Gold's claim of aiding and abetting is therefore significantly different from his claim of professional negligence, thus warranting the application of a different statute of limitations.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of district court.