# STATE OF MICHIGAN

# COURT OF APPEALS

MIDWEST MEMORIAL GROUP LLC, ACACIA
PARK CEMETERY, ALBION MEMORY
GARDENS, CADILLAC MEMORIAL
GARDENS EAST, CADILLAC MEMORIAL
GARDENS WEST, CHAPEL GARDENS,
EASTLAWN MEMORIAL GARDENS AND
MAUSOLEUM, ELM LAWN CEMETERY,
FLORAL VIEW MEMORIAL GARDENS,
FOREST LAWN MEMORIAL GARDENS,
GARDEN OF REST MEMORIAL PARK,
GRACELAND MEMORIAL PARK AND
MAUSOLEUM, GRANDLAWN CEMETERY
AND MAUSOLEUM, HILLCREST MEMORIAL
PARK, KENT MEMORIAL GARDENS,
MIDLAND MEMORIAL GARDENS, MOUNT
HOPE MEMORIAL GARDENS, NORTHLAND
CHAPEL GARDENS, OAKLAND HILLS
MEMORIAL GARDENS, OAKLAWN CHAPEL
GARDENS, OAKVIEW CEMETERY,
OAKWOOD MEMORIAL MAUSOLEUM,
RESTLAWN MEMORIAL GARDENS,
ROSELAND PARK CEMETERY, ROSELAWN
MEMORIAL GARDENS, UNITED MEMORIAL
GARDENS, WASHTENONG MEMORIAL
PARK AND MAUSOLEUM, WOODLAWN
CEMETERY, and WOODMERE CEMETERY

UNPUBLISHED
September 17, 2015

      Plaintiffs-Appellants/Cross-
      Appellees,

v

CITIGROUP GLOBAL MARKETS INC d/b/a
SMITH BARNEY, CURRIE KENDALL, PETER
JENSEN, CLAYTON SMART, KIMBERLY
SINGER, MARK SINGER, MKS FAMILY LLC,
INTERNATIONAL FUND SERVICES,

No. 322338
Ingham Circuit Court
LC No. 10-000025-CR

      Defendants,

and

-1-

PLANTE & MORAN PLLC,

        Defendant-Appellee/Cross-
        Appellant.

---

Before:  BORRELLO, P.J., and HOEKSTRA and O'CONNELL, JJ.

PER CURIAM.

The present appeal relates to the embezzlement of more than $60 million from twenty-eight cemeteries in Michigan and, more specifically, the purported failure of defendant Plante & Moran, PPLC ("Plante Moran"), an accounting firm, to detect any wrongdoing during an audit of the cemetery trust fund reports.  In particular, as it relates to the present appeal, plaintiffs brought claims of negligence and professional malpractice against Plante Moran.  Currently, plaintiffs appeal as of right, challenging the trial court's order denying plaintiffs' motion for reconsideration of the trial court's earlier order granting summary disposition to Plante Moran.  For the reasons explained in this opinion, we reverse the trial court's grant of summary disposition and we remand for further proceedings consistent with this opinion.

## I.  BASIC FACTS AND PROCEDURAL HISTORY

In 2003, Craig Bush, a Michigan attorney and businessman, owned several limited liability companies, which in turn owned the twenty-eight cemeteries in question in this case.  Among the limited liability companies Bush used to operate the cemeteries was Summerfield, LLC.  As of sometime in the fall of 2003, under Bush's control, there was approximately $68 million in cemetery trust funds at two Michigan banks in 56 different trust accounts, representing 2 accounts for each cemetery.[1]  In August of 2004, Bush sold the cemeteries and the limited liability companies, including Summerfield, to Clayton Smart, a self-proclaimed Oklahoma businessman with purported interests in oil and gas.  Smart continued to operate the cemeteries using Summerfield, LLC.

Once Smart had control of the cemeteries, he began to systematically loot the cemetery trust funds with the assistance of Mark Singer, a financial advisor who worked with Bush beginning in 2003 and who continued to work with the cemeteries after the transfer of ownership to Smart in August of 2004.  Between them, Singer and Smart colluded to steal more than $60

---

[1] The management of cemeteries in Michigan is governed by the Cemetery Regulation Act, MCL 456.521 *et seq*.  Under MCL 456.536, cemeteries are required to maintain two separate and distinct types of trust funds:  an irrevocable endowment fund for perpetual care and a merchandise trust fund.  MCL 456.536(1) and (2).  As the names suggest, the perpetual care trust is intended to ensure the perpetual care and maintenance of the cemetery, while the merchandise trust fund relates to monies prepaid by individuals for the purchase of cemetery items such as headstones, vaults, etc.  See MCL 456.536(1) and (2).

million from the cemeteries and their trust funds. To hide the theft of the cemetery trust funds, Singer and Smart generated sham investments in which the cemetery trust funds were purportedly invested. Most notably, some $38 million of co-mingled trust funds were theoretically invested in Hillcrest Capital Resource Limited (a purported money market fund) and Quest Minerals & Exploration, Inc (a company which supposedly held mineral reserves). Both these entities were, in actuality, fraudulent vehicles for nonexistent investments.

On April 8, 2005, while Smart's thefts from the cemeteries were ongoing, Summerfield's Chief Financial Officer (CFO) Rick Paskin contracted with Plante Moran for an audit of the cemeteries as mandated by Michigan's cemetery commissioner.[2] As set forth in the engagement agreement authored by Plante Moran, the purpose of the audit was to "examine management's assertions about Summerfield, LLC's compliance with" various Michigan statutes governing cemeteries and cemetery trust funds, including the requirement that funds be invested in keeping with Michigan's Prudent Investor Rule.[3] Plante Moran expended some 2,500 hours conducting the audit, but it wholly failed to detect the egregious looting of cemetery trust funds. Notably, one of the main issues of contention between the parties is Plante Moran's failure to investigate, or to adequately investigate, the Hillcrest and Quest investments, which were of course sham investments used to facilitate the embezzlement. Ultimately, Plante Moran issued twenty-eight independent auditor's reports for the cemeteries and, in each case, Plante Moran determined that Summerfield was largely compliant with the various statutory requirements.

In 2006, authorities in Michigan began to investigate Smart's ownership of the cemeteries, leading to criminal charges against numerous individuals, including Smart and Singer.[4] And, in December of 2006, an action was initiated in circuit court by the cemetery

---

[2] Under MCL 456.532(2), the cemetery commissioner must approve transfers in the ownership of cemeteries. In this case, the cemetery commissioner's approval of the transfer from Bush to Smart had been conditioned on all of the cemeteries retaining a new licensed Michigan Certified Public Account (CPA) to conduct the 2004 audit in the event that the audit from the previous year was rejected by the Department of Labor and Economic Growth (DLEG). The 2003 reports prepared by BDO Siedman were found to be unacceptable, which prompted the employment of Plante Moran.

[3] Relevant to Plante Moran's audit, under former MCL 456.35a(4), as amended 2003 PA 91, cemetery trust funds had to be invested subject to MCL 700.7302 of the estate and protected individuals code, 1998 PA 386. Under MCL 700.7302, as amended 1998 PA 386:

> Except as otherwise provided by the terms of the trust, the trustee shall act as would a prudent person in dealing with the property of another, including following the standards of the Michigan prudent investor rule. If the trustee has special skills or is named trustee on the basis of representation of special skills or expertise, the trustee is under a duty to use those skills.

[4] Similar investigations and charges also arose in Tennessee in connection to Smart's involvement with cemeteries in that state, and Singer was also indicted, in both Tennessee and

commissioner to end Smart's involvement with the cemeteries, and a conservator, Mark Zausmer, was appointed by the court to run the cemeteries. Incident to the order appointing Zausmer, part of Zausmer's authority as conservator included the authority to recover any property belonging to the cemeteries, including the authority to initiate lawsuits if necessary. In 2008, with court approval, Zausmer entered into an asset purchase agreement with plaintiff Midwest Memorial Group, LLC (MMG), which conveyed the cemeteries held by the various LLCs, as well as other assets, to MMG, including, most important to the present dispute, "[a]ll of the Conservator's, Seller's[5] and the Trusts' existing, pending, and future rights, claims, causes of action and defenses against all third parties" related to the assets and the cemeteries. The agreement in fact required MMG to expend "reasonable efforts" to pursue litigation.

In January of 2010, plaintiffs filed the current action against numerous defendants, including claims of negligence and professional malpractice against Plante Moran. Relevant to the present appeal, following discovery, Plante Moran moved for summary disposition under MCR 2.116(C)(10). After holding a hearing on Plante Moran's motion, the trial court granted summary disposition to Plante Moran, but it did so on a basis not raised by Plante Moran without deciding the legal issues presented by the parties. Namely, at the hearing on Plante Moran's motion, the trial court sua sponte raised the scope of the engagement agreement as a basis for granting summary disposition and then the trial court granted summary disposition based on its conclusion that the purportedly limited scope of the engagement agreement did not encompass detailed analysis of Quest and Hillcrest.

Following the trial court's decision, plaintiffs moved for reconsideration, arguing that the trial court deprived plaintiffs of due process by sua sponte granting summary disposition in this manner and that the trial court's substantive determination regarding the scope of the engagement was in error. The trial court denied plaintiffs' motion for reconsideration. Plaintiffs now appeal to this Court as of right. Plante Moran has also filed a cross-appeal, asserting as alternate grounds for affirmance the bases for summary disposition raised before, but not decided by, the trial court.

## II. STANDARD OF REVIEW

"This Court reviews de novo a trial court's decision on a motion for summary disposition." *White v Taylor Distrib Co, Inc*, 275 Mich App 615, 619; 739 NW2d 132 (2007). A trial court may grant summary disposition sua sponte under MCR 2.116(I)(1), which states that "[i]f the pleadings show that a party is entitled to judgment as a matter of law, or if the affidavits or other proofs show that there is no genuine issue of material fact, the court shall render judgment without delay." In comparison, a motion under MCR 2.116(C)(10) tests the factual sufficiency of a claim and is properly granted when no genuine issue of material fact remains. *Bagby v Detroit Edison Co*, 308 Mich App 488, 490; 865 NW2d 59 (2014). "When reviewing a motion brought under MCR 2.116(C)(10), this Court considers the pleadings, affidavits,

Indiana, for his role in cemetery trust fund looting schemes. Smart eventually pled guilty to 39 felony counts in Michigan.

[5] The term "Seller" as used in the agreement referred to Summerfield and several of Smart's other corporate entities.

-4-

depositions, admissions, and any other documentary evidence submitted by the parties in the light most favorable to the nonmoving party." *Braverman v Granger*, 303 Mich App 587, 596; 844 NW2d 485 (2014). "There is a genuine issue of material fact when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

Issues involving the interpretation of contracts, as well as the interpretation and application of statutes, are also reviewed de novo. *Bronson Methodist Hosp v Mich Assigned Claims Facility*, 298 Mich App 192, 196; 826 NW2d 197 (2012).

## III. THE TRIAL COURT'S BASIS FOR SUMMARY DISPOSITION

As noted, following discovery, Plante Moran moved for summary disposition under MCR 2.116(C)(10). Plante Moran argued that it was entitled to summary disposition because (1) the wrongful-conduct rule barred plaintiffs' claims, (2) plaintiffs could not establish causation given that Smart's theft occurred before the audit and that there was no evidence that anyone relied on Plante Moran's report, and (3) plaintiffs could not maintain an action under MCL 600.2962 of the Accounting Liability Act, 1995 PA 249, because they were not Plante Moran's client or non-clients identified in writing.

At the hearing on Plante Moran's motion, the parties attempted to address these issues raised by Plante Moran in its motion for summary disposition, but, acting sua sponte, the trial court instead directed the parties' attention to the scope of the engagement agreement. The trial court then granted summary disposition on this basis in a written opinion and order, concluding specifically that detailed analysis of the Quest and Hillcrest investments was outside Plante Moran's engagement agreement. In making this decision, the trial court focused solely on the contract and wholly dismissed plaintiffs' efforts to introduce other evidence, including expert testimony, to establish the applicable standard of care and Plante Moran's breach thereof. Although plaintiffs moved for reconsideration and attempted to present additional evidence in support of their motion, the trial court denied this motion in a cursory manner based on its conclusion that it had already considered the scope of the agreement at the hearing on Plante Moran's motion for summary disposition.

On appeal, relying on *Al-Maliki v LaGrant*, 286 Mich App 483, 485; 781 NW2d 853 (2009), plaintiffs first assert that by granting summary disposition on an issue not raised or briefed by the parties and by then denying their motion for reconsideration in a cursory manner, the trial court violated plaintiffs' right to due process by denying them a meaningful opportunity to be heard on the issue. Were we to conclude that the trial court denied plaintiffs of due process, we could reverse and remand on the basis alone. See *id.* at 489. However, rather than decide this case on the basis of the due process question, we instead exercise our discretion to decide the merits of the substantive issues before us at this time. That is, the parties have fully briefed the merits of the trial court's scope of engagement decision as well as the wrongful-conduct, causation, and Accounting Liability Act arguments raised by Plante Moran but not decided by the trial court. While some of these issues are unpreserved because they were not decided by the trial court, these issues involve significant questions of law, the consideration of which is necessary to a proper determination of the case, and the record contains the necessary facts to determine whether these arguments entitle Plante Moran to summary disposition. Cf.

*Smith v Foerster-Bolser Const, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006); *Hines v Volkswagen of Am, Inc*, 265 Mich App 432, 444; 695 NW2d 84 (2005). In these circumstances, we find it appropriate to exercise our discretion to address these claims. See *Smith*, 269 Mich App at 427; *Hines*, 265 Mich App at 444. We turn first to the scope of the engagement agreement to determine whether the trial court erred when it concluded that the scope of the engagement did not require Plante Moran to analyze the Quest and Hillcrest investments.

## A. SCOPE OF THE ENGAGEMENT AGREEMENT

Generally speaking, "[p]rofessional malpractice involves the breach of a duty owed by one rendering professional services to a person who has contracted for such services." *Saur v Probes*, 190 Mich App 636, 638; 476 NW2d 496 (1991). Such a claim "requires proof of simple negligence based on a breach of a professional standard of care." *Phillips v Mazda Motor Mfg (USA) Corp*, 204 Mich App 401, 409; 516 NW2d 502 (1994), abrogated on other grounds by *Ormsby v Capital Welding, Inc*, 471 Mich 45; 684 NW2d 320 (2004). Consequently, to state a claim for professional malpractice, and accounting malpractice in particular, a plaintiff must show: (1) the existence of an accountant-client relationship; (2) negligence in the performance of services by the accountant for the client; (3) causation; and (4) the fact and extent of injuries alleged. Cf. *Simko v Blake*, 448 Mich 648, 655; 532 NW2d 842 (1995) (detailing elements for an action for legal malpractice); see also *In re MuniVest Services, LLC*, 500 BR 487, 501 (2013).

When a professional enters into a contract to provide professional services, the contract evinces the existence of a professional relationship and it implicitly imposes on the professional the obligation to act in accordance with the standard of care applicable in the professional field in question. *Mieras v DeBona*, 452 Mich 278, 299; 550 NW2d 202 (1996) (opinion by BOYLE, J.). See also *Simko*, 448 Mich at 655. That is, "the legal standard of care for the rendition of professional duties is independent of the presence of an enforceable contract between the parties, and is a function of the defendant's professional status." Elizabeth Williams, 15 Causes of Action 2d 395, § 11 (2000). Thus, a tort claim and contract claim may arise from the same transaction, but they are two wholly separate claims, founded on different theories and different proofs. *Stewart v Rudner*, 349 Mich 459, 468; 84 NW2d 816 (1957). Consequently, although a contract may be relevant to understanding what services a professional has undertaken to provide, when evaluating a claim of professional malpractice, it is also necessary to consider governing professional norms to determine whether the professional satisfied the requisite standard of care. See, e.g., *Barnard v Dilley*, 134 Mich App 375, 378; 350 NW2d 887 (1984). See also Restatement (Third) of Torts: Liab. for Econ. Harm § 4 TD No 1 (2012), comment d. In particular, the standard of care owed to a client by virtue of a professional relationship may be imposed by statute, the common law, or in keeping with a professional code of responsibility. *Saur v Probes*, 190 Mich App 636, 638; 476 NW2d 496 (1991).

Because accountants belong to a state licensed profession, see MCL 339.722, they are subject to civil actions for malpractice under the Revised Judicature Act. See MCL 600.2912; MCL 600.2962(1). Further, "accountants are a profession traditionally subject to common-law malpractice liability," and as such they are subject to the common-law principles articulated in malpractice actions generally. See *Local 1064, RWDSU AFL-CIO v Ernst & Young*, 449 Mich 322, 333; 535 NW2d 187 (1995); MCL 600.2912(1). Consequently, while accountants are not required to guarantee perfection in their services, they are required to act with the same degree of

diligence and skill as would an accountant of ordinary learning, judgment or skill, in the same or similar community, under the same or similar circumstances. Cf. *Cox v Bd of Hosp Managers for City of Flint*, 467 Mich 1, 20-21; 651 NW2d 356 (2002) (applying common-law standard of care to nurses); *Simko*, 448 Mich at 656 (discussing attorneys' common-law standard of care). See also M Civ JI 30.01; Restatement (Second) of Torts § 299A (1965).[6] This professional standard of care is defined by the standard of practice in the community. See *Decker v Rochowiak*, 287 Mich App 666, 686; 791 NW2d 507 (2010). Moreover, because a layperson is not equipped to judge the standard of practice applicable in a professional community, *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 492; 668 NW2d 402 (2003), "an expert is usually required to establish the standard of conduct, breach of the standard, and causation," *Dean v Tucker*, 205 Mich App 547, 550; 517 NW2d 835 (1994). See also *Law Offices of Lawrence J Stockler, PC v Rose*, 174 Mich App 14, 52; 436 NW2d 70 (1989).

In this case, Plante Moran entered into an agreement to provide a professional opinion with respect to Summerfield's compliance with certain specified statutory provisions relating to the operation of cemeteries for the year 2004. The agreement stated that Plante Moran's examination "will include tests of your records and other procedures we consider necessary to enable us to express an opinion as to whether management's assertions regarding compliance contained in the 2004 Cemetery Report are fairly stated, in all material respects based on conformity with" the enumerated public acts listed in the agreement. Many of the various statutory provisions in question relate to the trust funds, how the trusts are funded, how they are invested, etc.[7] Among the statutory requirements to be considered was, for example, the

---

[6] In terms of professional codes of conduct, certified public accounts are called to conduct themselves in accord with AIPCA's Code of Professional Conduct, which requires accountants to possess the knowledge necessary to complete services according to professional standards, "applying his or her knowledge and skill with reasonable care and diligence." AIPCA Code of Professional Conduct and Bylaws (2004), § 201. Typically, the work of accountants and auditors is "measured by Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Auditing Standards ("GAAS"), promulgated by the American Institute of Certified Public Accountants." Elizabeth Williams, 15 Causes of Action 2d 395, § 12 (2000); see also *Hecht v Andover Assoc Mgt Corp*, 47 Misc 3d 520, 522; 6 NYS3d 427 (2015). And, a professional performing an attestation engagement in particular is called to "observe each of the attestation standards" set forth in the AIPCA Statements on Standards for Attestation Engagements, and to exercise due professional care, which requires the exercise of reasonable care and diligence with the understanding that an accountant holding himself out to the public will be seen as "possessing the degree of skill commonly possessed by others in the same employment[.]" AIPCA Statements on Standards for Attestation Engagements, p 1278 (2001), quoting D. Haggard, *Cooley on Torts*, 472 (4th ed., 1932).

[7] In more detail, as set forth in the agreement, Plante Moran agreed to examine management's assertions about Summerfield's compliance with "Public Act 251 of 1968 as amended, Section 456.536(1),(2),(3); Rule 456.125; Rule 456.131(1),(2); Rule 456.132; Rule 456.133(1),(2),(3); Rule 456.137(1),(2),(3),(5),(6),(7); Rule 456.161(1),(2); Rule 456.1 62(1),(2),(3),(4); Rule 456.163(1),(2),(3),(4),(5),(6); Rule 456.164(1),(2),(3); Rule 465.165(1),(2),(3) and Public Act 87

requirement that the cemeteries' trust funds be invested in accord with Michigan's Prudent Investor Rule. See MCL 456.35a(4), as amended 2003 PA 91; MCL 700.7302, as amended 1998 PA 386.

Considering the language in the contract, it is obvious that the engagement agreement was not a specific agreement to investigate the Quest and Hillcrest investments or to detect fraud in relation to these investments. However, it is equally true that the Quest and Hillcrest investments were not excluded from the examination and, in fact, the agreement does not purport to specify which investments or records in particular will be examined. Rather than detail the specific records to be examined, the contract is broadly written to provide an agreement to conduct an audit relating to compliance with various cemetery related statutory provisions in accord with governing professional norms. Cf. *Barnard*, 134 Mich App at 378 ("It was not a contract to perform a specific act, but one to exercise appropriate legal skill in providing representation in a lawsuit."); *Penner v Seaway Hosp*, 169 Mich App 502, 510; 427 NW2d 584 (1988) (finding no agreement between doctor and patient for any specific act and instead concluding that "the only acts that the decedent agreed to allow the hospital to perform were those that were deemed necessary or advisable in the professional judgment of the attending physician"). Consequently, if professional norms dictate that analysis of Quest and Hillcrest is necessary to conducting a compliance audit under the circumstances, there is nothing in the plain language of the contract to place such analysis beyond the scope of the agreement or outside the scope of the professional relationship. Stated differently, Plante Moran may not have had an express contractual obligation to examine the Quest and Hillcrest investments in detail, but nonetheless it may have had a professional obligation to do so when such conduct would be considered necessary to comply with governing professional norms when conducting an audit regarding compliance with particular statutory provisions. Cf. *Barnard*, 134 Mich App at 378; *Penner*, 169 Mich App at 510.

For example, Plante Moran plainly agreed to "test" records and it had broad authority to engage in "other procedures" to assess management's assertions for material conformity with the statutory provisions. In this context, what records Plante Moran selected to "test," how it tested those records, what level of detail was involved in the testing, and what "other procedures" it chose to employ under the circumstances of the audit were issues of professional judgment that require expert testimony to assess and that cannot simply be measured by whether there was a clear contract violation.[8] Indeed, by entering into the agreement, Plante Moran assumed an

_____

of 1855, as amended, Section 456.35(1),(2),(3); Section 456.35a(1),(2),(3),(4),(5); and Section 456.36, and Public Act 12 of 1869, as amended, Section 456.106a; Section 456.107a(1),(2),(3),(4),(5); and Section 456.115 for the year ended December 31; 2004 included in the 2004 Cemetery Report."

[8] In contrast, the trial court excused any shortcomings in Plante Moran's performance based on certain caveats in the agreement, noting that, under the agreement, management was responsible for the accuracy of the "basic information" supplied to Plante Moran and that "[s]ince [Plante Moran] will not perform a detailed examination of *all* transactions, a material misstatement caused by error or fraud *may* exist and not be detected by us[.]" We do not suggest that Plante Moran had to examine "all" records or test every assertion made by management; but, the fact remains that the agreement called for Plante Moran to "test" some records and institute "other

implicit obligation to follow the governing standard of care applicable to accountants, see *Mieras*, 452 Mich at 299 (opinion by BOYLE, J.), and tellingly the contract itself expressly provided that "examination will be conducted in accordance with attestation standards established by the American Institute of Certified Public Accountants" (AICPA). Given this clear reference to these standards, to ascertain the particular duties owed by Plante Moran under the contract it was obviously necessary, at a minimum, to look to the AICPA rules to determine what attestation standards demand when conducting a compliance audit of the type contemplated in the agreement. Likewise, given the contract's express reference to numerous statutory provisions, it is obviously necessary to consider these statutes to determine what reasonable accountants would do to "examine management's assertions" and "express an opinion" about "compliance" with these provisions. These issues are clearly ones involving matters of professional judgment and, for this reason, plaintiffs have available expert testimony from CPA Karl J. Schulze to opine regarding specific instances in which Plante Moran failed to abide by the standard of care and violated the AICPA attestation standards while conducting its audit to assess compliance with the various cemetery provisions.[9] Given the potential testimony of

procedures" Plante Moran considered necessary and, in doing so, Plante Moran had a responsibility to act with the care expected by the professional community, which according to plaintiffs' expert required going beyond the "basic information" supplied by Summerfield to more in-depth analysis and information gathering, particularly with respect to Quest and Hillcrest. Indeed, more generally, we do not suggest that Plante Moran guaranteed the detection of internal fraud. But, the thrust of plaintiff's claim is not that Plante Moran's audit was designed to necessarily detect internal fraud, but that a compliance audit conducted in accord with professional norms required a more thorough examination of the cemeteries' investments—as explained by plaintiffs' expert—and that incident to such an examination, the fraud would have been apparent, and Plante Moran was obligated—professionally and contractually—to "advise" Summerfield of "any matters of that nature that come to our attention." In other words, Plante Moran could not, under professional norms or even the simple terms of the contract, turn a blind eye to fraud it would have discovered had it followed professional norms when conducting a compliance audit. In these circumstances, Plante Moran simply cannot point to these contractual disclaimers as a means to escape liability for failing to perform the agreed upon compliance audit with the diligence, knowledge, skill and ability ordinarily possessed by members of the accounting profession. Restatement (Third) of Torts: Liability for Economic Harm § 4 TD No 1 (2012), comment e (recognizing that a professional can contractually define the scope of an undertaking, but may not "disclaim responsibility for the use of due care in performing it").

[9] For example, Schulze's affidavit identifies numerous specific instances in which, in violation of the AICPA attestation standards, Plante Moran failed to, for example, obtain sufficient evidence to provide a reasonable basis for its conclusions, it failed to conduct sufficient search and verification involving independent sources to minimize attestation risk, it failed to accumulate sufficient evidence to subject management's assertions to compliance with the statutory provisions, failed to review the cemeteries' trust agreement, and that, given this was a cemetery compliance audit, Plante Moran failed to use appropriate individuals with the specialized knowledge to conduct such an audit. More specifically, Schulze is prepared to opine that a more in-depth examination of Quest and Hillcrest investments would have been particularly

plaintiffs' expert, it would appear that a fact question remains regarding what the standard of care demanded in the circumstances of this case and whether Plante Moran breached that standard by failing to conduct a more in-depth analysis of Hillcrest and Quest.

In sum, the mere fact that analysis of Quest and Hillcrest was not specified in the agreement does not place such analysis outside the scope of the professional relationship when there is evidence to support plaintiffs' assertion that such analysis would be required under governing professional norms when conducting the type of compliance audit contracted for in the engagement agreement. Because a question of fact remains regarding the applicable standard of care and whether there was a breach thereof, and such a question is best answered with the aid of expert testimony, the trial court erred by granting summary disposition based on the purportedly limited scope of the agreement.

## IV. ALTERNATE GROUNDS FOR AFFIRMANCE

As discussed, the trial court granted summary disposition sua sponte on a basis not raised by Plante Moran or addressed in the parties' trial court briefing. Having concluded that the trial court's decision regarding the scope of the engagement agreement was in error, we now turn to the bases for summary disposition raised by Plante Moran in its motion for summary disposition and addressed by Plante Moran in its cross-appeal as alternate grounds for affirming the trial court's decision to grant summary disposition. Namely, we now consider whether plaintiffs are precluded from filing an accounting malpractice suit by MCL 600.2962(a) because they are not clients, whether Smart's wrongful-conduct prevents plaintiffs from pursuing their claim of accounting malpractice against Plante Moran, and finally, whether a question of fact remains with respect to whether plaintiffs can establish causation.

### A. ASSIGNMENT OF CLAIMS UNDER MCL 600.2962(a)

Regarding the Accounting Liability Act, Plante Moran contends that, because it entered into the engagement agreement in question with Summerfield in particular, MMG and the cemeteries were not the "client" in the professional relationship and they are thus precluded from bringing an action for malpractice under MCL 600.2962.[10] Because any claim arising out of MCL 600.2962(a) was assigned to MMG incident to the asset purchase agreement and the

---

appropriate under the circumstances of Plante Moran's audit when one considers, for example, Plante Moran's obligation to opine on whether these investments satisfied Michigan's Prudent Investor Rule and the large proportion of co-mingled cemetery trust funds that were invested in these companies. Indeed, plaintiffs' expert is of the opinion that, if Plante Moran could not obtain sufficient information to reasonably offer an opinion, it should have refrained from issuing an opinion or it should have issued an adverse opinion.

[10] Plante Moran also argues that plaintiffs have not shown fraud or misrepresentation as required under MCL 600.2962(b) and that plaintiffs were not third parties referenced "in writing" as required to file suit under MCL 600.2962(c). However, we find it unnecessary to consider these assertions because it is clear that plaintiffs have filed suit incident to MCL 600.2962(a) based on the assignment of those claims incident to the sale from the conservator to MMG.

version of MCL 600.2962(a) in effect at all relevant times does not prohibit the assignment of claims, we find Plante Moran's contentions in this respect to be without merit.

MCL 600.2962 describes the situations in which an accountant may be held liable for professional malpractice. At the time the claims of accounting malpractice at issue in this case accrued, and at the time that plaintiffs filed suit, MCL 600.2962 provided:

> This section applies to an action for professional malpractice against a certified public accountant. A certified public accountant is liable for civil damages in connection with public accounting services performed by the certified public accountant only in 1 of the following situations:
>
> (a) A negligent act, omission, decision, or other conduct or the certified public accountant if the claimant is the certified public accountant's client.
>
> (b) An act, omission, decision, or conduct of the certified public accountant that constitutes fraud or an intentional misrepresentation.
>
> (c) A negligent act, omission, decision, or other conduct of the certified public accountant if the certified public accountant was informed in writing by the client at the time of engagement that a primary intent of the client was for the professional public accounting services to benefit or influence the person bringing the action for civil damages. For the purposes of this subdivision, the certified public accountant shall identify in writing to the client each person, generic group, or class description that the certified public accountant intends to have rely on the services. The certified public accountant may be held liable only to each identified person, generic group, or class description. The certified public accountant's written identification shall include each person, generic group, or class description identified by the client as being benefited or influenced. [MCL 600.2962, as amended 1995 PA 249.]

As this provision makes plain, there are three basic situations in which an accountant may be held liable for malpractice: (1) those involving negligence and a client; (2) those involving fraud or misrepresentation; and (3) those involving negligence and a third party when it has been set forth "in writing" that the third party was intended to benefit from, or rely on, the accountant's services.

While former MCL 600.2962 sets forth the circumstances in which a claim of malpractice may arise, it does not expressly address the assignment of these claims.[11] Further,

_____

[11] MCL 600.2962 has since been amended by 2012 PA 268, and, as a result of this amendment, MCL 600.2962(2)(a) now addresses the issue of assigning a claim from the client to someone else. Such assignments are now prohibited, but this general prohibition does not apply to actions involving the cemetery regulation act or the prepaid funeral and cemetery sales act. In particular, MCL 600.2962(2)(a), as enacted 2012 PA 268, now states:

we are not aware of any Michigan case to address whether a claim of accounting malpractice may be assigned in light of MCL 600.2962. The legality of assigning accounting malpractice claims under MCL 600.2962(a) was, however, addressed in *Riley v Ameritech Corp, Inc*, 147 F Supp 2d 762, 766-771 (ED Mich 2001).[12] Although not binding, *Riley* provides persuasive analysis of MCL 600.2962(a) that is consistent with the statute's plain language and Michigan's general rule that "all legitimate causes of action are assignable." See *Grand Traverse Convention & Visitor's Bureau v Park Place Motor Inn, Inc*, 176 Mich App 445, 448; 440 NW2d 28 (1989).

In particular, in *Riley*, the Court considered the plain language of MCL 600.2962(a) and rejected the argument that MCL 600.2962 should be read restrictively to prevent assignment. *Riley*, 147 F Supp at 771. Instead, the Court recognized that "nothing in [the statute] prevents the client from assigning its legitimate cause of action consistently with the general rule" that all legitimate claims are assignable under Michigan law. *Id.* Given that the statute does not prohibit the assignment of claims, we agree with *Riley* that such additional language should not be read into the plain language of the statute to impose such a restriction. See *Attorney Gen v Pub Serv Com'n*, 247 Mich App 35, 42; 634 NW2d 710 (2001). The *Riley* court further aptly recognized that, unlike a third-party beneficiary type action brought under MCL 600.2962(c), "an assignment such as the one asserted in this case [under MCL 600.2962(a)] is based solely on the duty the accountant owed his/her client" and "[t]hus, allowing the assignment claim in this case would not expand [the accountant's] liability beyond that anticipated by [MCL 600.2962.]." *Riley*, 147 F Supp at 771. In other words, the assignment of a claim under MCL 600.2962(a) does not create a new cause of action and the accountant is not exposed to liability unanticipated by the statute.

Given that Michigan generally permits the assignment of claims and that nothing in MCL 600.2962 prohibits a client from assigning his or her claims, we conclude that the *Riley* court reached the correct decision and we hold that a claim under MCL 600.2962(a), as amended by 1995 PA 249, is assignable.[13] Consequently, because MMG obtained Summerfield's rights to

> (2) A certified public accountant is not liable for civil damages in any of the following situations:
>
> (a) The claimant is not the certified public accountant's client, but asserts standing to sue based on an assignment of the claim from the client to the claimant. This subdivision does not apply to an action arising out of an annual report required by the cemetery regulation act, 1968 PA 251, MCL 456.521 to 456.543, or the prepaid funeral and cemetery sales act, 1986 PA 255, MCL 328.211 to 328.235.

[12] Although decisions of a federal district court interpreting Michigan law are not binding on Michigan courts, we may consider the reasoning of a federal court decision for its persuasive value. See *Linsell v Applied Handling, Inc*, 266 Mich App 1, 16; 697 NW2d 913 (2005).

[13] As noted, MCL 600.2962 has now been amended to expressly prohibit the assignment of accounting malpractice claims except in limited circumstances. See MCL 600.2962(2)(a), as amended by 2012 PA 268. We view this change as a further indication that assignments were not prohibited under the old version of the statute. See *Huron Twp v City Disposal Sys, Inc*, 448

sue third parties incident to the purchase agreement reached with the conservator, MCL 600.2962 does not prevent plaintiffs from pursuing a claim of malpractice against Plante Moran.

## B. THE WRONGFUL CONDUCT RULE

Next, Plante Moran contends that the wrongful-conduct rule applies to this case to prevent plaintiffs from pursuing their claims against Plante Moran. Specifically, Plante Moran maintains that Smart's wrongful conduct would preclude Smart from pursuing relief against Plante Moran and, relying on corporate agency principles, Plante Moran argues that Smart's conduct and knowledge must be imputed to Summerfield such that, by virtue of imputation, Summerfield—and MMG as its assignee—cannot maintain an action against Plante Moran for its alleged negligence in conducting the audit it was hired to perform. For the reasons explained below, we conclude that imputation does not apply and that the wrongful-conduct rule is therefore inapplicable on the facts of this case.

### i. THE WRONGFUL-CONDUCT RULE GENERALLY

Long-enshrined in Michigan's jurisprudence is the maxim that "no man shall take advantage of his own wrong." *Garwols v Bankers Trust Co*, 251 Mich 420, 426; 232 NW 239 (1930). See also *McDonald v Hall*, 193 Mich 50, 62; 159 NW 358 (1916). This general principle prevents a plaintiff from maintaining an action if, "in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party." *Orzel v Scott Drug Co*, 449 Mich 550, 557; 537 NW2d 208 (1995) (citation omitted). Similarly, under the doctrine of pari delicto, when an action is based on a plaintiff's illegal conduct in which the defendant has also participated, courts will not "decide, as between two scoundrels, who cheated whom the more." *Manning v Noa*, 345 Mich 130, 133; 76 NW2d 75 (1956). Consequently, "[a]s between parties in pari delicto, that is equally in the wrong, the law will not lend itself to afford relief to one as against the other, but will leave them as it finds them." *Orzel*, 449 Mich at 557-558 (citation omitted). These judicially created prohibitions on allowing a wrong-doer to seek legal redress in the courts based upon his or her own illegal or immoral conduct are known collectively as the "wrongful-conduct rule." *Id.* at 558.

### ii. IMPUTATION OF WRONGFUL-CONDUCT

In this case, no one disputes the applicability of the wrongful-conduct rule insofar as it would obviously apply to prevent Smart from seeking any sort of recovery from Plante Moran. The real issue is whether Smart's misconduct may be imputed to Summerfield and the cemeteries, and whether this imputation prevents the cemeteries and MMG from now seeking damages from Plante Moran occasioned by Plante Moran's alleged negligence, if any, in performing an audit that failed to detect Smart's wrongdoing.

Regarding imputation, as a general proposition, "[a] corporation can only act through its employees," and for this reason, knowledge acquired by an employee in the course of employment is imputed to the corporation, and an employee's conduct while in the scope of

Mich 362, 366; 531 NW2d 153 (1995) (recognizing that generally "an amendment is to be construed as changing the statute amended").

-13-

employment will be considered the acts of the corporation. *Upjohn Co v New Hampshire Ins Co*, 438 Mich 197, 213; 476 NW2d 392 (1991); *New Props, Inc v George D Newpower, Jr, Inc*, 282 Mich App 120, 134; 762 NW2d 178 (2009). It follows that, when a corporate actor has engaged in wrongdoing, the wrongful acts of the corporate officer may be imputed to the corporation and may bar recovery by the corporation under the wrongful-conduct rule. See *MCA Fin Corp v Grant Thornton, LLP*, 263 Mich App 152, 160-162; 687 NW2d 850 (2004). In other words, the corporation is treated as having engaged in the wrongdoing and is therefore prevented from seeking to profit from the wrongdoing by pursuing relief against third parties in court. See *id.* at 161. By extension, as a general principle, an assignee, or a successor corporation, "stands in the shoes of the assignor and acquires the same rights as the assignor possessed," meaning that an assignee is "subject to the same defenses" that the assignor would have faced. *First of Am Bank v Thompson*, 217 Mich App 581, 587; 552 NW2d 516 (1996); see also *Langley v Harris Corp*, 103 Mich App 287, 290; 303 NW2d 1 (1980).

For the wrongful acts of a corporate officer to be imputed to a corporation, those acts must occur (1) in the course of employment and (2) for the benefit of the corporation. *MCA Fin Corp*, 263 Mich App at 163. Acts are not done for the benefit of the corporation, and thus may not be imputed to the corporation, "if the actions were adverse to the corporation's interests," meaning that "the agent must be acting solely in his own interest and against the interest of his principal." *Id.* at 164. See also *In re Mediators, Inc*, 105 F3d 822, 827 (CA 2 1997) ("The [adverse interest] exception is a narrow one and applies only when the agent has 'totally abandoned' the principal's interests."). Under this adverse interest exception to the imputation of wrongful conduct, when assessing whether conduct is adverse to the corporation's interests, "it is the wrongdoers' motives, not results, that are determinative." *MCA Fin Corp*, 263 Mich App at 165. Consequently, the adverse interest exception "will not apply if the wrongdoers' motivation was not entirely for personal gain at the expense of the corporations, but was, even in part, a misguided belief that their wrongdoing would benefit the corporations." *Id.*

Although the adverse interest exception will generally preclude imputation of an actor's conduct, actions adverse to the corporation's interests may nevertheless be imputed to the corporation when the actor is the "sole actor." *Nat'l Turners Bldg & L Ass'n v Schreitmueller*, 288 Mich 580, 586; 285 NW 497 (1939). As explained in *MCA Financial Corp*, 263 Mich App at 169,

> The sole actor rule comes into play where the wrongdoer is, in essence, the corporation (the "sole actor"). Indeed, it has its roots in cases where the agent and the principal are literally the same person (literally a "sole actor") and thus information obtained by a person in his role as an agent is treated as also being obtained in his role as principal, even if his activities as agent are contrary to his interests as a principal. . . . Therefore, where the wrongdoer acts contrary to the interests of the corporation, under the adverse interest exception the wrongdoer's conduct would not ordinarily be imputed to the corporation. But where the wrongdoer is a sole actor, the adverse interest exception is not applied and his wrongdoing is nevertheless imputed to the corporation. For example where a sole shareholder loots the corporation of its assets the adverse interest exception will not apply. [*Id.*]

-14-

The rationale for this rule is that when there is a sole actor, there is "never a breakdown in communications between the agent and his principal" because they are, practically speaking, one and the same, both in knowledge of the actions undertaken and in the authority to undertake those acts. See *Reider v Arthur Andersen, LLP*, 47 Conn Supp 202, 213; 784 A2d 464 (2001); *In re Mediators, Inc*, 105 F3d 822, 827 (CA 2 1997).

Given that the application of the sole actor rule hinges on the existence of a sole actor, see *Nat'l Turners Bldg & L Ass'n*, 288 Mich at 586, it follows that "where there is an innocent decision maker, the wrongdoer cannot be a sole actor and, therefore, the adverse interest exception will apply," *MCA Financial Corp*, 263 Mich App at 170. For the existence of an innocent decision-maker to preclude application of the sole actor rule, there must "exist[] at least one innocent decision maker who, if he had been alerted to the fraud, could have stopped it." *Id.* at 169.[14] See also *In re NM Holdings Co, LLC*, 411 BR 542, 549 (ED Mich 2009).

### iii. ANALYSIS

Turning to the facts of the present case, Smart played a primary role in the embezzlement of more than $60 million from the cemetery trust funds. Consequently, the wrongful-conduct rule undoubtedly applies to bar Smart from seeking recovery from Plante Moran for its alleged professional negligence in failing to detect Smart's wrongdoing. See *Orzel*, 449 Mich at 557. But of course Smart is not a plaintiff in this case. He no longer has any involvement with the cemeteries, he has been criminally punished, he did not profit from the sale of the cemeteries, and he will not benefit financially from the present lawsuit. As noted, the real issue of contention is whether Smart's misconduct may be imputed to Summerfield, and whether this imputation prevents the cemeteries and MMG from now seeking damages from Plante Moran occasioned by Plante Moran's alleged negligence, if any, in performing an audit that failed to detect Smart's wrongdoing.

Turning to the imputation question, at the time he perpetrated the thefts from the cemetery trust funds, Smart was the owner and principal operator of Summerfield and consequently the cemeteries. As a general proposition, given Smart's corporate role, his conduct and knowledge may be imputed to Summerfield and the cemeteries, provided that some exception does not apply. See *MCA Fin Corp*, 263 Mich App at 163.

---

[14] The Court in *MCA Financial Corp* discussed the relevance of an innocent decision-maker to the assessment of whether an actor is the sole actor for purposes of imputing conduct adverse to the corporation. However, because the Court did not apply the sole actor rule, it ultimately found it unnecessary to employ these innocent decision-maker principles. See *MCA Financial Corp*, 263 Mich App at 170. Here, we do find it necessary to consider the existence of an innocent actor because plaintiffs allege that Paskin, Funk, and the cemetery commissioner are innocent decision-makers in this case. In reply, Plante Moran offers no substantive argument as to why this rule should not be employed. In our judgment, as explained in *MCA Finanical Corp*, the existence of innocent decision-makers is relevant to a determination of whether there is a sole actor for imputation purposes. See *In re NM Holdings Co, LLC*, 411 BR at 549.

However, Smart's actions involved the blatant looting of cemetery trust funds for his own personal gain with no intent to benefit the cemeteries or Summerfield. Given that his actions were wholly adverse to the corporate interests and those of the cemeteries, the adverse interest exception to the general rule imputing wrongful-conduct to the corporation may apply to prevent the imputation of Smart's conduct to the cemeteries. See *id.*; *New Props, Inc*, 282 Mich App at 135; *Schacht v Brown*, 711 F2d 1343, 1348 (CA 7 1983).

But, of course, Smart was the sole shareholder of Summerfield and the principal operator, meaning that we must also consider whether the "sole actor" exception to the adverse interest rule applies. On the unique fact of this case, we find the sole actor rule inapplicable given the cemetery commissioner's statutory authority and obligation to act for the protection of the cemeteries and the interests of the public.[15] See, e.g., MCL 456.529, as amended 22 PA 2004; MCL 456.538(1), as amended 22 PA 2004. That is, when approving the sale of the cemeteries from Bush to Smart, the cemetery commissioner made an audit a condition of her approval. After a previous audit performed by BDO Seidman was rejected, Paskin, who was innocent of any wrongdoing, contracted with Plante Moran for a compliance audit. The resulting audit report was then submitted to the cemetery commissioner. Had Plante Moran uncovered Smart's wrongdoing and included such findings in its report, the cemetery commissioner would have had both the statutory authority and statutory obligation to intervene for the protection of the cemeteries and the public.[16]

---

[15] Aside from the cemetery commissioner, plaintiffs maintain that corporate insiders, namely controller Brad Funk and CFO Risk Paskin, were innocent of any wrongdoing and could have acted to stop Smart's fraud. Although this is potentially true, Smart's deposition testimony indicates that these individuals were wholly under his authority and, given this evidence, we are not persuaded that plaintiffs' claim to the contrary is sufficiently supported to survive a motion for summary disposition. See *Quinto v Cross & Peters Co*, 451 Mich 358, 363; 547 NW2d 314 (1996). That is, while it is undisputed that Funk and Paskin were innocent and that they held corporate roles, the record is not developed in terms of their actual authority in relation to the cemeteries and their trust funds to establish whether they actually could have countermanded Smart's fraud. Further, while one would hope that they would have acted to help the cemeteries if alerted to Smart's activities, the record includes no evidence to support this supposition. In other words, plaintiffs have not presented evidence in opposition to Plante Moran's motion for summary disposition to suggest that these individuals could have or would have stopped Smart's fraud. Cf. *Breeden v Kirkpatrick & Lockhart, LLP*, 268 BR 704, 710-714 (SDNY 2001).

[16] For more than 100 years, it has been the recognized policy of this state, "in common with the universal sentiment of mankind, to preserve and maintain the burial places of the dead." *Avery v Forest Lawn Cemetery Co*, 127 Mich 125, 129; 86 NW 538 (1901). For this reason, in 1968, the Legislature enacted the Cemetery Regulation Act, 251 PA 1968, which regulates the creation and maintenance of cemeteries and established a cemetery commission. Those operating cemeteries subject to the Cemetery Regulation Act are required to register with the cemetery commissioner. MCL 456.535. By statute, the cemetery commission is given a broad grant of authority to act for the protection of cemeteries, the solvency of trust funds, and the welfare of the public. For

-16-

Indeed, when Smart's wrongdoing was uncovered, the cemetery commissioner initiated court action that resulted in seizure of the cemeteries from Smart, the appointment of a conservator, and the subsequent sale of the cemeteries to MMG by the conservator with court approval on the condition that MMG use reasonable efforts to pursue litigation against third parties. This progression, and the role of the cemetery commissioner in the procedural history, underscores the reality that the cemetery commissioner was an innocent actor, operating independent of Smart's control, with both the statutory authority and obligation to intervene for the protection of the cemeteries and the public interest. In such circumstances, Smart cannot be considered a sole actor. Cf. *McRaith v BDO Seidman, LLP*, 391 Ill App 3d 565, 591-595; 909 NE2d 310 (2009); *Reider*, 47 Conn Supp at 218. Consequently, because Smart was not the sole actor and his acts were adverse to the corporation, his conduct may not be imputed to Summerfield and the wrongful-conduct rule does not prevent plaintiffs from pursuing their claims against Plante Moran.

## C. CAUSATION

Finally, in arguing for the affirmance of the trial court's grant of summary disposition, Plante Moran also maintains plaintiffs' claim must fail because plaintiffs cannot establish causation.[17] With respect to causation, Plante Moran maintains that plaintiffs have not shown that anyone relied on the audit reports and that, in the absence of reliance, the reports cannot be a cause of plaintiffs' injuries. Alternatively, Plante Moran asserts that the embezzlement occurred before Plante Moran's audit such that Plante Moran's reports cannot be a cause of plaintiffs' injuries.

---

instance, an application for a cemetery may be denied, or a permit suspended or revoked, by the commissioner when an individual shows a lack of "integrity to protect the public welfare" or violates provisions of the Cemetery Regulatory Act. MCL 456.538(1), as amended 22 PA 2004. The trust funds established for the cemeteries are statutorily mandated for the perpetual care of cemeteries, see MCL 456.536(1), (2), (3) as amended 22 PA 2004, and the auditing of trust funds is required, MCL 456.530(1), as amended 22 PA 2004. The commissioner is empowered to visit and examine the affairs of any cemetery and must be given free access to books, papers, records and other documents related to the business of the cemetery. MCL 456.532a, as amended 22 PA 2004. The commissioner may hold hearings, issue cease and desist orders, and impose penalties for violations of the Cemetery Regulatory Act. MCL 456.529(1) and (2), as amended 22 PA 2004; MCL 456.538(3), as amended 22 PA 2004. Perhaps most notably, as was ultimately done in the present case, the cemetery commissioner may initiate court action to compel compliance with the Cemetery Regulatory Act and incident to such court action a conservator or receiver may be appointed. MCL 456.529(2)(c) and (3), as amended 22 PA 2004. In short, under Michigan law, cemeteries are heavily regulated to preserve the solvency of trust funds and to protect cemeteries in perpetuity for the public interest, and the cemetery commissioner is entrusted to act for the protection of cemeteries and their trust funds in the interests of the public.

[17] To some extent the trial court decided the issue of causation, concluding that Plante Moran could not have caused plaintiffs' injuries because Plante Moran's engagement agreement did not require detailed analysis of Quest and Hillcrest. As we discussed *supra*, the trial court's conclusions regarding the scope of the agreement were in error.

As discussed *supra,* to state an action for accounting malpractice, a plaintiff must show: (1) the existence of an accountant-client relationship; (2) negligence in the performance of services by the accountant for the client; (3) causation; and (4) the fact and extent of injuries alleged. See *Simko*, 448 Mich at 655. "Proof of causation requires both cause in fact and legal, or proximate, cause." *Haliw v Sterling Hts*, 464 Mich 297, 310; 627 NW2d 581 (2001). "Cause in fact requires that the harmful result would not have come about but for the defendant's negligent conduct." *Id.* "On the other hand, legal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Id.* (citation and quotation marks omitted). In professional malpractice actions, an expert is usually required to establish causation. *Dean*, 205 Mich App at 550. Further, causation is generally a question for a trier of fact, although it can be decided as a matter of law by the courts where this is no genuine issue of material fact. *Holton v A+ Ins Assoc, Inc*, 255 Mich App 318, 326; 661 NW2d 248 (2003).

In accounting malpractice cases in particular, when an accountant is accused of failing to uncover financial wrongdoing or other financial straits within a company, courts have routinely required the plaintiff to make a showing of reliance on the audit report to establish that the allegedly deficient audits were a cause in fact of any resulting harm. See *In re NM Holdings Co, LLC*, 622 F3d 613, 619-620 (CA 6 2010) and cases therein. The reason for this is simple: if no one relied on the reports so as to "be lulled by the audits in failing to detect" the financial perils faced by the company, then the harm would have occurred even without the accountant's audit and the accountant cannot be considered a cause of the resulting in harm. *Id.* See also *FDIC v Ernst & Young*, 967 F2d 166, 170 (CA 5 1992) ("If nobody relied upon the audit, then the audit could not have been a 'substantial factor in bringing about the injury.'"). Typically, such reliance would be expected to involve reliance on the audit by insiders within the corporation who would have the authority to stop or prevent additional harm. See generally *In re NM Holdings Co, LLC*, 622 F3d 619-624; *FDIC v Ernst & Young*, 967 F2d at 170. However, as we have discussed, in some situations, an outside entity or official may have a statutory obligation and responsibility to review a company's fiscal welfare for the protection of the public and to take immediate action when necessary to preserve the company's solvency. See, e.g., *Reider*, 47 Conn Supp at 215. In such cases, reliance by the outside entity on an accountant's reports may be used to establish causation because, had the report uncovered the financial wrongdoing, the outside entity would have stepped in for the public's benefit and stopped additional harm from occurring. See *id.* at 226-227.

In this case, Plante Moran contends that, to establish causation, plaintiffs must show reliance on the reports by Smart, which plaintiffs cannot do because Smart in no way relied on the reports in relation to his looting scheme. See *FDIC*, 967 F2d at 170. Further, because Smart was the sole actor, Plante Moran asserts that his knowledge of his financial misdeeds and, by extension, his lack of reliance on the audit must be imputed to Summerfield as well as the cemeteries so as to preclude a determination that these entities relied on Plante Moran's reports. Given its assertion that this knowledge must be imputed to Summerfield and the cemeteries, Plante Moran also argues that plaintiffs may not contend that the state's reliance on the report establishes causation because the cemeteries should not be able to recover for not being "rescued" by a third party from wrongdoing that the cemeteries knew to be ongoing by virtue of the imputation of Smart's knowledge to Summerfield and the cemeteries. See generally *In re NM Holdings Co, LLC*, 411 BR at 547-548.

-18-

Problematic with these arguments is that in this case, as discussed *supra*, Smart's actions were wholly adverse to the interests of the cemeteries, which generally precludes imputation of his knowledge to the cemeteries. See *New Props, Inc*, 282 Mich App at 134. In this case in particular, as we have discussed, it is uncontested that the reports generated by Plante Moran were submitted to the state. The cemetery commissioner was in a position to step in for the protection of the public and the cemeteries, and in such circumstances the state's reliance on Plante Moran's reports can give rise to a finding of causation because the state would have intervened for the sake of the public and the cemeteries had Plante Moran conducted a thorough audit.[18] See *Reider*, 47 Conn Supp at 226-227. That is, the reports generated by Plante Moran were not limited to internal use at Summerfield; they were in fact submitted to the state and, under the Regulatory Cemetery Act, the cemetery commissioner had an obligation to intervene for the protection of the public. In these circumstances, reasonable minds could conclude that action would have been taken by the cemetery commissioner to protect the cemeteries if Plante Moran's audit had revealed the fraudulent activity undertaken by Smart and his cohorts. Consequently, Plante Moran's alleged negligence in failing to detect any wrongdoing by Smart could thus be seen as both a cause in fact and a proximate cause of plaintiffs' injuries. Because a question of fact remains with regard to whether Plante Moran's negligence was a cause of the cemeteries' injuries, Plante Moran is not entitled to summary disposition on the basis of its reliance arguments.

Aside from the question of reliance, Plante Moran also contends that plaintiffs were not harmed by their audit because the looting in question occurred *before* Plante Moran was retained. Contrary to Plante Moran's arguments, it appears a question of fact remains regarding the timing of the fraudulent dealings and whether a professionally conducted audit by Plante Moran could have prevented some of plaintiffs' losses. In particular, Plante Moran cites to Smart's deposition testimony for the assertion that all wrongdoing was accomplished before Plante Moran's audit. Plante Moran's overly simplified representation of the issues involved and its reliance solely on Smart's testimony ignores the complicated nature of the transactions involved and dismisses, without explanation, plaintiffs' claim, supported by expert testimony, that not only could losses have potentially been prevented, but the cemeteries would still have been able to recoup losses during the timeframe of Plante Moran's audit if Plante Moran had uncovered the fraud in connection with an audit conforming to professional standards. That is, plaintiffs' expert has examined the various financial records and transactions, and is willing to opine that Plante Moran's negligence resulted in a loss of $27 million. There are numerous documents detailing the financial dealings involved and affidavits from Schulze attesting to his proposed testimony regarding his trace of the trust funds and his conclusion that $27 million of injury can be attributed to Plante Moran's negligence.[19] Briefly summarized, while much of the embezzlement

---

[18] Plante Moran asserts on appeal that the cemetery reports were rejected by the state such that the cemetery commissioner cannot be said to have relied on the reports. To our knowledge, no one from the state has indicated that the report was rejected, and there does not appear to be any documentation from the state to support this assertion.

[19] Plante Moran has not raised any challenges on appeal with respect to Schulze's qualifications or his accounting methodologies.

occurred in 2004, before the audit, from Schulze's analysis and trace of the funds, it appears that there were fraudulent transfers ongoing during the audit and the possibility that funds could have been recovered with timely detection by Plante Moran incident to an audit conducted in accordance with the applicable standard of care. At a minimum, given Schulze's analysis and proposed testimony it appears that a question of fact remains regarding causation and, for this reason, the matter should be left for a jury to decide with the aid of expert testimony. See *Holton*, 255 Mich App at 326; *Dean*, 205 Mich App at 550.

## V. CONCLUSION

In sum, Plante Moran is not entitled to summary disposition. Contrary to the trial court's conclusions, detailed analysis of Quest and Hillcrest was not necessarily outside the scope of the engagement agreement and the propriety of more detailed examination must instead be judged in light of the governing standard of care. Regarding Plante Moran's additional arguments, we conclude that MMG was properly assigned claims under former MCL 600.2962(a), as amended 1995 PA 249, that the wrongful-conduct rule does not bar plaintiffs' claims, and that material questions of fact remain with respect to causation. Consequently, the trial court erred by granting Plante Moran's motion for summary disposition.

Reversed and remanded. We do not retain jurisdiction. Having prevailed in full, plaintiffs may tax costs pursuant to MCR 7.219.

/s/ Joel P. Hoekstra
/s/ Stephen L. Borrello

-20-